THE STATE v. CALE BRADFORD, Appellant.—24 S. W. (2d) 993.

Division Two, February 19, 1930.

696

*McKay & Peal* and *Ward & Reeves* for appellant.

*Stratton Shartel*, Attorney-General, and *A. M. Meyer*, Assistant Attorney-General, for respondent.

COOLEY, C.—Defendant, Cale Bradford, was convicted in the Circuit Court of New Madrid County, on change of venue from Pemiscot County, of murder in the second degree, for the killing of one Jesse Fulgham, and sentenced to ten years' imprisonment in the penitentiary, and he appeals.

Deceased lived at Yarbro, Arkansas, a mile or so from the Missouri-Arkansas state line. Defendant lived in Pemiscot County, Missouri, near the state line. On the evening of September 3, 1927, both were at a dance at the home of one Frazier in Pemiscot County. The State's evidence tends to show that about the time the dance "broke up" deceased and one Flowers, a witness for the State, went to deceased's car, intending to go home. They had gotten in the car when defendant, with J. W. Thomason, Rayburn Thomason and Bill Cahoon, approached, and one of them asked Flowers if he were Jesse Fulgham, to which Flowers replied: "No, sir." Thereupon deceased said: "Here I am." One of the Thomasons then asked deceased if he was the son-of-a-bitch who had arrested him (Thomason) and taken a half pint of liquor from him. Deceased denied being that man and said he could prove it. They all started toward the dance platform, seemingly for the purpose of settling the question of identity, but before reaching it J. W. Thomason struck deceased in the face with his fist, causing deceased to stagger backward, and as deceased staggered back from the blow, defendant drew a pistol and shot him through the body, inflicting a mortal wound, from which death ensued about noon the next day. The State's evidence tended to show that there had been no previous quarrel and no angry or offensive language used, except the question above mentioned, prior to the blow by Thomason and the shooting, and that none of the men appeared to be angry. The evidence

indicates that there was very little conversation and that defendant said nothing to deceased or deceased to him.

Defendant's evidence was to the effect that he had not previously known deceased or had any difficulty with him; that he and J. W. Thomason were going toward the latter's car, Rayburn Thomason walking ahead of them, when he heard Rayburn speak to Flowers and deceased, and he and J. W. Thomason stopped to hear what was said. The version of the conversation at deceased's car given by defendant and his witnesses differs somewhat from that of the State's witnesses, the chief difference being that, according to defendant's witnesses, the term "son-of-a-bitch" was not used, and the question asked deceased was whether he was the man who had arrested Thomason and taken some money (instead of liquor) from him; that they all started toward the dance platform to settle the question of identity; that Cahoon, who had not been with them at first, was noticed by deceased, who said to Cahoon: "Are you my friend?" To which Cahoon replied that he was everybody's friend, whereupon deceased avowed that he was not afraid of any God-damned son-of-a-bitch; that Cahoon thereupon took deceased by the arm, telling him not to do that and to come with him, and deceased jerked loose and began to strike defendant who, up to that time, had said nothing and taken no part in the proceedings; that Cahoon then caught hold of defendant and "hollered for some one to get the other fellow;" that deceased continued to strike defendant in the face with his fist and then "made a play back to his pocket" and started toward defendant, taking one step toward him, when defendant shot deceased. There was but one shot fired. There was evidence from defendant's side that the blow received by deceased was struck by J. W. Thomason while defendant was being held by Cahoon and was being struck by deceased, and that the blow staggered or pushed deceased away from defendant, and that it was at this juncture that deceased made a movement toward his pocket and started toward defendant just before the shot was fired. Defendant claimed that he shot deceased in self-defense, believing that his life was in danger; that he had not said or done anything to provoke deceased and did not know deceased was angry until the latter began striking him. There was also evidence offered by defendant to the effect that deceased was intoxicated, and that he had brought whisky to the dance to sell and had sold some there that night. There was no evidence that defendant or the Thomasons were under the influence of liquor.

The court admitted and there was read in evidence, over the objections and exceptions of defendant, the testimony in chief given by one K. W. Chapman at defendant's preliminary examination. Chapman was a resident of Yarbro, Arkansas, and was not called as a wit-

ness at the trial. His testimony at the preliminary examination had been taken down in shorthand by the official reporter and thereafter transcribed by the reporter and given to the prosecuting attorney. The reporter identified his transcript at the trial and the aforesaid testimony of Chapman was read from that transcript. This evidence was read for the purpose of proving a dying declaration of deceased. Chapman's testimony thus introduced was that· he lived at Yarbro, Arkansas, had been justice of the peace for twelve years, knew deceased, but did not know defendant or the Thomason brothers; that he was at deceased's house on Sunday morning (September 4th) after he was shot and talked with him about his condition. In narrative form the statements made to him by deceased are as follows: I talked with him, trying to get him to let us send him to the hospital at Memphis. He said there wasn't any use, he was going to die, that he wouldn't live but an hour or two and that he would rather die at home. I asked him how it happened and he tried to tell me about it. He said he took some negroes up there about Hermandale, he was running a jitney car. He said it was either three or four walked up right close to his car and got hold of Jim Flowers and asked if his name was Fulgham and that he said no, that his name was Flowers, and Jesse said he just spoke up and said: "Here I. am, what do you want?" And he said Rayburn Thomason asked him if he wasn't the son-of-a-bitch that arrested him about the line one day and took a half pint of whisky from him, and he said he guessed he must be mistaken, and he said then John Will Thomason hit him in the eye and Cale Bradford shot him while he was falling.

I.  Defendant charges error in the admission of the testimony of Chapman given at the preliminary examination, to which he sufficiently objected at the time and saved exceptions.

As stated above, Chapman's testimony was taken down by a stenographer at the preliminary examination and later transcribed and given to the prosecuting attorney. It is not shown to have been signed by the witness and certified by the magistrate, as provided by Sections 3825 and 3834, Revised Statutes 1919. The testimony of the stenographer and the magistrate's certificate to his transcript, which was introduced in evidence, indicate that the testimony of the witness was neither so signed by the witness nor certified by the magistrate. Such testimony, therefore, is not given official status or authenticity by virtue of those statutory provisions because not taken and preserved pursuant thereto. The fact that it was taken by the official court reporter does not add to its legal standing or effect, since he is not an officer of the magistrate's court and was not acting in his official capacity when taking testimony

in such court. So far as the admissibility of this testimony is concerned it stands upon the same footing as would testimony at any preliminary examination where defendant was present and permitted to cross-examine, not taken and preserved in the manner prescribed by the statutes referred to.

In State v. Moore, 156 Mo. 204, 56 S. W. 883, the fact that the testimony there in question had been reduced to writing, signed and certified as provided by statute, is referred to in the opinion as though it might be a factor in determining its admissibility on the subsequent trial, though the decision is not based upon that ground, but upon the principle announced in State v. McO'Blenis, 24 Mo. 402. In the Moore case the witness whose testimony was offered was dead at the time of the trial.

In State v. Barnes, 274 Mo. 625, 204 S. W. 267, where also the witness whose testimony was offered had died, it was said that it makes no difference whether the testimony was certified by the examining magistrate or not; that it was admissible under the common law rule, recognized in the McO'Blenis case, "which has not been changed by statute, that testimony taken as in the instant case may be admitted in evidence, the sole prerequisite to its admission being, in the absence of any question as to its correctness, (1) a showing that the witness is then dead; (2) the presence at the time of the taking of the testimony of the defendant; and (3) his right to cross-examine the witness." The Barnes case, however, was a prosecution for burglary and larceny in which the statute does not provide for the reduction to writing and the signing and certification of testimony taken at the preliminary examination, such statutory requirement applying only to homicide cases. [Sec. 3825, supra.]

The admission of such testimony when the witness was dead constituted an exception to the rule against hearsay evidence generally recognized at the common law and it was held in effect, in State v. McO'Blenis, supra, that our constitutional provision guaranteeing a defendant the right to be confronted by the witnesses against him was adopted with that exception recognized. But in State v. Houser, 26 Mo. 431, the court said that at common law the exception above referred to did not apply in a case where the witness was not dead, though out of jurisdiction, and refused to allow it in a case where the witness had been recognized to appear and had disappeared and could not be found. The rule permitting the State to use the testimony given by a witness at a preliminary examination only when the witness was shown to be dead at the time of the trial was followed in this State until the decision of this court en banc in State v. Harp, 320 Mo. 1, 6 S. W. (2d) 562, in which we overruled State v. Houser, supra, in so far as the latter case held that the exception above mentioned should not be allowed where the witness was liv-

ing but beyond the jurisdiction of the court and his presence at the trial not procurable. The decision on that point in the Harp case is in harmony with the great weight of authority in this country and we do not understand appellant to challenge it, but he insists, and we think correctly, that it is not authority for the admission of the evidence of witness Chapman in this case.

In State v. Harp, supra, defendant, on trial for murder, had been convicted and on appeal the judgment was reversed and the cause remanded. On the second trial the State was permitted to read in evidence the testimony given at the first trial by a witness, Mercer, which had been preserved in a duly authenticated bill of exceptions. Mercer was a non-resident of the State and could not be found. It was shown that diligent but unavailing efforts had been made by the prosecuting attorney and the sheriff to locate him and procure his attendance. Nothing that could have been done to insure the witness's presence at the trial had been omitted. His testimony at the first trial had been preserved in the only way provided therefor. by law. If necessity to prevent a miscarriage of justice and diligence on the part of the State could justify the admission of the evidence there in controversy, its admission was justified.

In the instant case we have a widely different situation. The testimony of the witness at the preliminary examination was not signed by the witness as required by statute. Section 3828, Revised Statutes 1919, requires the examining magistrate to bind by recognizance all material witnesses against the prisoner to appear and testify before the court having cognizance of the offense, and Section 3830, Revised Statutes 1919, empowers him to enforce the giving of such recognizance. When the witness is brought within the jurisdiction of the circuit court that court may require recognizance for his future appearance. It does not appear that any of those statutory requirements were complied with. There is no showing that any effort was made to procure the attendance of the witness Chapman or any explanation of his failure to attend other than the bare fact that he resided at Yarbro, Arkansas, about a mile from the Missouri state line.

In State v. Jamerson, 252 S. W. 682, we held inadmissible the testimony given by a witness at the preliminary examination who had died prior to the trial, because it was not signed by the witness as required by Section 3825, supra, although, as stated in the opinion, the witness had died before the stenographer had an opportunity to transcribe her notes and have the witness sign same. We there said:

"It was conceded that Jim Graves was dead at the date of trial, and that he never signed any statement as required by Section 3825, Revised Statutes 1919. Said section reads as follows:

" 'In all cases of homicide, but in no other, the evidence given by the several witnesses shall be reduced to writing by the magistrate, or under his direction, and shall be signed by the witnesses respectively.'

"The above section has been a part of our statutes a great many years. It is *sui generis* in its provisions, relates solely to homicides, and requires, under the circumstances of this case, that the testimony of the witnesses shall be signed by the latter.

"After diligent research we have been unable to find in this State any reported homicide case in which the unsigned testimony of a dead witness taken at the preliminary hearing was held to be competent evidence, except in the case of State v. Carlisle, 57 Mo. l. c. 105, where it is said:

" 'The record shows that the witness's name was signed to the evidence by another person, at witness's request, he being too weak to sign the same.'

"The court, with some hesitation, *held* the above to be a sufficient signing by the witness.

"The motive which actuated the General Assembly in the enactment of above section is a matter of no concern to the court in this investigation. Said body was vested with jurisdiction to pass such law, and, whether sound or otherwise, it is mandatory in its terms, and must be followed in this proceeding. Upon a retrial of the case the above testimony of Jim Graves should be excluded."

If the decision in State v. Jamerson, supra, is to be adhered to it is decisive of the question now under consideration. The soundness of the conclusion in that case, on the facts there stated, may be open to question, because of the death of the witness before there was opportunity to sign his testimony, if considerations of necessity and public policy are to be regarded in determining the question. Of course if the statute governs and is mandatory, as its terms indicate, it would not admit the exception. In any event there is no such excuse in this case for not having had the testimony signed.

The purpose of the statute in requiring testimony given at preliminary examinations to be reduced to writing and signed by the witness is not clear. If that purpose is to preserve it for use in case of the possible death of the witness, the query suggests itself, why did it not include other felonies as well as homicide. But the same question arises whatever the purpose of the statute may be. As said in the Jamerson case, that question is not the concern of the courts. The Legislature with power to enact the law did enact it and it should be observed by those charged with the administration of the law.

It may be urged, and there is force in the suggestion, that the neglect of some of its officers to observe statutory requirements should not be permitted to deprive the State of evidence which can be produced in another, if less satisfactory, way, and which may be important or even necessary in bringing an offender to justice. The welfare of the State and of society demands the sure and speedy punishment of crime. But in the long run that welfare is not best subserved by disregarding or whittling away in zeal for law enforcement the constitutional and statutory safeguards provided for the protection of individual rights. The importance of examination and cross-examination in the presence of the court and jury and of the appearance and manner of the witness while testifying is too well recognized to require comment. When by due diligence that is not procurable and testimony previously given by the witness is offered in lieu thereof, if the law prescribes the preservation and authentication of such testimony in a certain way that method should be followed. In a criminal trial where life or liberty is at stake at least as much diligence and observance of statutory requirements should be demanded of the State as would be required of a party to a civil action where, for example, an unsigned deposition cannot be used unless the signature is waived. Upon the facts shown in this case we think the testimony of the witness Chapman should have been excluded.

II. Defendant makes the further point that the court erred in admitting the testimony of Chapman without first hearing evidence and determining the competency of the alleged dying declaration in the absence of the jury. It is doubtful if defendant sufficiently indicated that he was objecting or excepting on that ground, but in view of our ruling that the testimony should have been excluded on other grounds we need not consider that assignment or the contention that the court erred in refusing defendant's requested instruction cautioning the jury as to how a dying declaration should be considered, or the further contention that certain portions of the statement testified to by Chapman were not competent as dying declarations.

III. Defendant assigns error in the admission of the testimony of witness Flowers detailing the conversation at deceased's car just before the shooting. Defendant did not himself take part in the conversation, but he was present. He had gone to the car with the Thomasons and when deceased said he could prove he was not Jesse Fulgham and the party started toward the dance platform, defendant went along.

The distance from the car to the platform was only twenty or thirty feet and somewhere in that short space of time and distance the fatal encounter took place. The occurrence at the car and the difficulty in which the shooting occurred were not separate and dissociated occurrences but were so intimately connected as to constitute parts of a continuous transaction. The testimony as to what transpired at the car was competent.

IV. It is claimed that the instruction on manslaughter did not properly define that offense and that since defendant was convicted of a higher degree of homicide it was prejudicial error for the court to fail to give a correct instruction on manslaughter, since, if properly instructed, the jury might have convicted him of the lesser offense. The instruction given on manslaughter reads as follows:

"The court instructs the jury that if you find the defendant, Cale Bradford, not guilty of murder in the first degree or murder in the second degree, then you will consider whether or not under the testimony in the case the defendant is guilty of manslaughter.

" 'Manslaughter' is the killing of a human being not herein declared to be murder or excusable or justifiable homicide; and the court instructs the jury that if you believe and find from the evidence, beyond a reasonable doubt, that the defendant, Cale Bradford, at the County of Pemiscot and State of Missouri, on the 3rd day of September, 1927, with a loaded pistol intentionally shot and killed the said Jesse Fulgham without malice and without premeditation, as these terms are hereinbefore explained, and under such circumstances that it is not justifiable or excusable homicide, and not in the lawful defense of his person, as defined in other instructions, then you will find the defendant guilty of manslaughter and assess his punishment." (Here follows statement of punishment.)

" 'Excusable Homicide' as used in these instructions, means the accidental killing of another.

" 'Justifiable Homicide' as used in these instructions, means the killing of another in the lawful defense of one's person, as more fully explained in other instructions given herein."

The above instruction was a substantially correct definition of manslaughter under our present statute. [State v. Gore, 292 Mo. 173, 237 S. W. 993.]

V. Complaint is made of the court's refusal to grant defendant a continuance because of the absence of two material and important witnesses. In view of the conclusion we have reached it is unnecessary to consider this assignment of error as the witnesses or their depositions may be procured on another

trial. Other alleged errors assigned need not be discussed as the things complained of may not occur again.

For the error in the admission of the evidence above pointed out the judgment is reversed and the cause remanded for new trial. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur, except *Walker, J.,* absent.