**STATE of Missouri, Respondent,**

v.

**Fred LUTTRELL, Appellant.**

No. 49444.

Supreme Court of Missouri,

Division No. 1.

April 8, 1963.

Charles M. Shaw, Clayton, for appellant.

Thomas F. Eagleton, Atty. Gen., Albert J. Stephan, Jr., Asst. Atty. Gen., Jefferson City, for respondent.

DALTON, Presiding Judge.

By an information filed in the Circuit Court of St. Charles County on January 6, 1962, the defendant was charged with murder in the first degree. He was convicted of murder in the second degree and his punishment assessed at 20 years' imprisonment in the state penitentiary. He has appealed from the judgment and sentence entered against him. While defendant was represented by able counsel in the trial court, he is not represented by counsel in this court and he has not favored us with a brief. We must therefore review the assignments of error in his motion for a new trial and further examine the record as required by Supreme Court Rule 28.02, V.A.M.R.

The State's evidence tended to show that, on November 6, 1961, the defendant resided with his wife, Velma, and a stepdaughter, Judy Walker, age fourteen years, in a trailer in St. Peter's, St. Charles County, Missouri.

Wallace B. Orsech, hereinafter referred to as the deceased, was a police officer of the St. Louis Metropolitan Police Department. He resided in St. Louis County and was not on duty at the time he was killed. Orsech was married, but had had marital difficulties over money matters and was not living with his wife either on the day of his death or on the preceding day. Mr. and Mrs. Orsech met the defendant and his wife for the first time on December 31, 1960, at a New Year's Eve party held at the Orsech home. Mrs. Orsech had not visited defendant's home, but Mr. and Mrs. Orsech had seen defendant and his wife several times socially prior to November 6, 1961, and defendant and his wife had visited the Orsechs at their house on Hanley Road in St. Louis County.

About 11 o'clock on the evening of November 4, 1961, the deceased, who was off duty, came to the home of one Alton K. Love in St. Louis County. He was then dressed in a police uniform and had with him his service revolver that had been issued to him by the Metropolitan Police Department, "a special thirty-eight." At the Love home the gun was in a holster attached to a Sam Browne belt which the deceased wrapped around the weapon and placed it in a foot locker. The following day, Sunday, November 5, deceased spent in the Love home watching television. The next day the deceased, wearing cotton trousers and a shirt, went with Love to Love's place of employment and remained with him from nine a. m. until three p. m., as Love performed his duties as a filling station employee. The deceased then went with Love to the Bluebird, a local tavern, where they stayed together until 4 o'clock, at which time Love left and defendant entered the tavern and started visiting with deceased. About 4:30 p. m. the deceased, accompanied by the defendant, drove a pickup truck into Love's filling station. The truck bore the name of "Fred Luttrell, St. Peter's, Missouri", but defendant was riding as a passenger and the deceased was driving. After the gas tank was filled, defendant and deceased left in a westerly direction.

They arrived together at the defendant's trailer home about 6:15 p. m. The deceased and defendant entered and were seated on a divan, with defendant seated next to deceased and deceased next to Judy, while they watched "TV". After ten or fifteen minutes the defendant and the deceased both left the trailer and deceased thereafter returned with a carton of beer, which he gave to defendant's wife, and again seated himself on the divan to watch "TV". A few minutes later defendant re-entered the room carrying a shotgun and he shot the deceased twice with a 16-gauge Remington shotgun from a distance of ten to fifteen feet, killing him. The gun was later found on top of a pickup truck, where it had been placed by the defendant as he went to a neighbor's home to report the killing. Subsequently a police officer found two spent shells in the trailer near the place where the defendant stood at the time the gun was fired. They had been fired from the shotgun found on top of the pickup truck.

When the officers arrived they found the deceased in a sitting position on the divan with his hands in his lap; he appeared to be dead. There was no pulse, the eyes were open but did not dilate when a flashlight was shone in them. No breathing could be detected and there was a large hole in deceased's chin and up through his mouth; the left side of his face was torn away and also his left ear, and he had bled profusely.

After defendant telephoned for the police, he asked his neighbor to come over and see the man he had killed. Defendant told her that he had shot the man; that the man "had made a pass at his stepdaughter, Judy," and had also been "messing around with his wife." Defendant also told a deputy sheriff that he had shot the man.

Although the defendant testified at the trial that the deceased had a ".38 short-barrel, loaded revolver" in his possession, Judy, who was seated next to the deceased on the divan, had not seen any such gun at any time. Other evidence tended to show that the deceased owned no such pistol, had no such gun in his possession and that he had had none except the one issued to him by the police department which was found, after deceased's death, in the locker where he had placed it on November 4. Defendant's wife, who testified in defendant's behalf, had not seen a gun in deceased's possession at any time during the evening of November 6. At the trial defendant admitted that he had killed the deceased by shooting him. Defendant further testified that, prior to the shooting, deceased had a .38 short-barrel, loaded revolver, and had pointed it at him, and had threatened him at various times that evening. Defendant

did not know what happened to the revolver after he shot the deceased. One of the police officers made a search for such a pistol in and about the trailer where the killing occurred, but no such pistol could be found. The defendant's testimony will be further reviewed in connection with an assignment of error in the motion for a new trial.

No question has been raised with reference to the information filed in this case, but since it is our duty under Supreme Court Rules 28.02 and 28.08 to determine its sufficiency, we shall set out a portion of it, as follows: " * * * that Fred Luttrell on the 6th day of November, 1961, in the County of St. Charles, State of Missouri, did then and there willfully and unlawfully deliberately, premeditatedly, feloniously and of his malice aforethought, make an assault upon one Wallace G. Orsech with a 16 gauge shotgun, shooting and inflicting mortal wounds from which the said Wallace B. Orsech died and did thereby kill and murder the said Wallace B. Orsech * * *."

It will be noted that the date of death is not expressly stated, except as may be inferred or as the allegations may tend to indicate that all events transpired on the date stated and had transpired prior to the filing of the information on January 6, 1962.

▮ At one time it was deemed essential that the information expressly allege not only the date the defendant inflicted the mortal wound, but also the date and place of death. See State v. Borders, Mo.Sup., 199 S.W. 180, 182. The Borders' case held that there was no necessity to plead or prove the place of death, but indicated that it was still necessary for the information to state the time of death. We do not find said requirement to have been changed by any specific decision. There are situations, however, where such an allegation is wholly unnecessary, as where other allegations or circumstances expressly show that the de-

ceased died within a year and a day after the offense sought to be charged, as in the present case. In this case the information charges the assault and shooting occurred on November 6, 1961, and the information was filed January 6, 1962, and it alleges that defendant "did thereby kill and murder the said Wallace B. Orsech." The record further shows the trial and conviction of defendant on the 21st of February 1962, all within one year after the alleged date of the shooting. The allegations of the information were therefore sufficient under Supreme Court Rule 24.01 and defendant could not have been prejudiced by any failure to more specifically allege the date of death. State v. Brookshire, Mo.Sup., No. 49152, —— S.W.2d ——. And see Supreme Court Rule 24.11, which provides: "No indictment or information shall be deemed invalid, nor shall the trial, judgment or other proceedings thereon be stayed, arrested or in any manner affected: * * * for stating the time imperfectly, * * * or, * * * for the want of an allegation of the time or place of any material fact, when the time and place have once been stated in the indictment or information * * *."

While it would have been better for the information to have alleged the date of death, it was nevertheless sufficient under the facts of this case and under Supreme Court Rule 24.11.

The first assignment of error in the motion is to the effect that the court erred in permitting the prosecuting attorney to introduce into evidence and to read to the jury a transcript of the testimony of Elizabeth Orsech, deceased's widow, as given by her at defendant's preliminary hearing held on November 30, 1961, before the Honorable Webster Karrenbrock, Judge of the Magistrate Court of St. Charles County. The transcript of such testimony was permitted to be read to the jury in lieu of the testimony of the witness in person. The transcript was not signed by the witness as required by Sec. 544.370 RSMo 1959, V.A.M.S. and Supreme Court Rule 23.12,

nor was the transcript of the testimony of this witness certified by the magistrate to the circuit court upon the completion of the preliminary hearing, nor when defendant was bound over to appear in the circuit court to answer a felony charge of murder in the first degree. It is contended that the admission of this evidence denied the defendant his right to be confronted by the witness against him in the trial of the cause; that the State had failed to use due diligence in securing the presence of the witness at the trial; that no effort had been made to have the State extradite the witness as a material witness; that the transcript of the testimony was not signed by the witness as required to preserve it for future use; and that the transcript was not a correct transcript of the witness' testimony, nor properly certified.

The testimony had been taken down at the preliminary hearing by one Harry Wellington, the official court reporter of the circuit court of the county where the preliminary hearing was held, and it had thereafter been transcribed. Witness Wellington testified that the transcript was a true and correct transcript of Mrs. Orsech's testimony. The record shows that counsel for defendant also objected to the admission of the transcript in evidence on the ground: (1) that it was hearsay; (2) that the transcript had not been signed by the witness, as required; (3) that it deprived the defendant of confrontation by the witness; and (4) that under the facts given to the court and shown by the record it did not appear that the State had exercised due diligence in securing the attendance of the witness to testify at the trial. Counsel for defendant admitted that defendant and his counsel were present in the Magistrate Court of St. Charles on November 30, 1961, for the preliminary hearing in this cause and that Harry Wellington was present and took down the testimony of said witness after she was duly sworn, but the defendant denied that the transcript in question was a true and correct transcript.

The State insists that the court did not err in admitting the transcript in evidence and that defendant's right to confront the witnesses against him was not violated "because a proper showing was made of diligence on the part of the State in attempting to locate Elizabeth Orsech" and to have her present at the trial. It is also contended that the admissibility of testimony taken at a preliminary hearing was not abolished by the Legislature's enactment of Sec. 491.420 RSMo 1959, V.A.M.S. permitting the extradition of material witnesses, and that said statute does not apply when it is shown, as here, that the location of the witness is unknown. The State further contends that, even if the trial court erred in its ruling, the error, if any, in admitting the evidence was harmless error, and its admission should not require the reversal of the judgment or the remanding of the cause for a new trial. The State cites Supreme Court Rule 25.13 and numerous cases, none of which support the State's contention under the facts of this case. See State v. Kain, Mo.Sup., 330 S.W.2d 842, 843; State v. Lloyd, 337 Mo. 990, 87 S.W.2d 418, 420.

Supreme Court Rule 23.12, applicable to preliminary examinations in felony cases, provides that in all cases of homicide the evidence given by the witnesses shall be reduced to writing by the magistrate or under his direction and shall be signed by the witnesses respectively. The rule conforms to the provisions of Sec. 544.370 RSMo 1959, V.A.M.S. And see Sec. 544.-390 and Supreme Court Rule 23.11.

This court in State v. Banton, 342 Mo. 45, 111 S.W.2d 516, 518, has held that the purpose of the statute was to secure a fair preliminary examination and to preserve the testimony taken. However, this court in several cases has held that the admission of testimony taken at a preliminary hearing and transcribed, but *not signed* and not certified by the magistrate was not admissible and that the admission of such evidence at the trial was reversible error.

In the case of State v. Bradford, 324 Mo. 695, 24 S.W.2d 993, 996[1], this court said:

"It may be urged, and there is force in the suggestion, that the neglect of some of its officers to observe statutory requirements should not be permitted to deprive the state of evidence which can be produced in another, if less satisfactory, way, and which may be important or even necessary in bringing an offender to justice. The welfare of the state and of society demands the sure and speedy punishment of crime. But, in the long run, that welfare is not best subserved by disregarding or whittling away in zeal for law enforcement the constitutional and statutory safeguards provided for the protection of individual rights. The importance of examination and cross-examination in the presence of the court and jury and of the appearance and manner of the witness while testifying is too well recognized to require comment. When by due diligence that is not procurable, and testimony previously given by the witness is offered in lieu thereof, if the law prescribes the preservation and authentication of such testimony in a certain way, that method should be followed. In a criminal trial, where life or liberty is at stake, at least as much diligence and observance of statutory requirements should be demanded of the state as would be required of a party to a civil action, where, for example, an unsigned deposition cannot be used unless the signature is waived. Upon the facts shown in this case, we think the testimony of the witness Chapman should have been excluded."

In State v. Jamerson, Mo.Sup., 252 S.W. 682, 687[5] the court said: "It is contended by appellant that reversible error was committed by the trial court in admitting, over the objection of defendant, the unsigned testimony of Jim Graves, alleged to have been given at the preliminary hearing before the justice, and transcribed by the stenographer who took down the evidence at said hearing. It was conceded that Jim Graves was dead at the date of trial, and that he never signed any statement as required by section 3825, R.S.1919. * * * The above section has been a part of our statutes a great many years. It is sui generis in its provisions, relates solely to homicides, and requires, under the circumstances of this case, that the testimony of the witnesses shall be signed by the latter. * * * The motive which actuated the General Assembly in the enactment of above section is a matter of no concern to the court in this investigation. Said body was vested with jurisdiction to pass such law, and, whether sound or otherwise, it is mandatory in its terms, and must be followed in this proceeding. Upon a retrial of the case the above testimony of Jim Graves should be excluded."

█ We find no basis in the record for the State's contention that the testimony of Mrs. Orsech, as set out in the transcript, was not prejudicial and "reveals little information of any real significance to the issues of the case." The transcript shows that Mrs. Orsech testified that she was the widow of the deceased; that she last saw him alive two days before his death; and that her deceased husband owned only one pistol, the one issued to him by the police department. It is true that the effect of such testimony was minimized by her subsequent testimony that, when she returned home on November 6, 1961, she found her husband's police uniform, but no pistol. The State says her testimony that her husband had only one pistol was helpful to the State only if the jury disbelieved the testimony of witness Love about the pistol having been placed in the foot locker in Love's home where it was later found; and that the admission of the testimony was harmless error and does not warrant a reversal. Whether the testimony was helpful or hurtful depended upon how the jury may have considered it and what portion of it they believed. If her husband owned only one pistol and if it was in Love's foot locker, the testimony of the witness might be considered in conflict with defendant's testimony that Orsech had a pistol in his

possession at the time the defendant shot him. In any event, we are satisfied that the admission of the transcript of this witness' testimony was prejudicial and reversible error, and for this error the judgment must be reversed and the cause remanded for a new trial.

■ Among other assignments in the motion for a new trial is the contention that the court erred in refusing to instruct on manslaughter; that such an instruction was requested and refused and that the facts in the case warranted such an instruction. We think this assignment wholly insufficient, under the facts of this case, to comply with Supreme Court Rule 27.20 in that it does not set forth in detail and with particularity the specific grounds or cause therefor, in that it does not indicate in any manner what facts in evidence were considered sufficient to warrant such an instruction. We cannot know (1) whether defendant wanted an instruction on manslaughter based upon violence to his person sufficient for an inference of heat of passion and, therefore, "lawful provocation", which may reduce the grade of the crime in a homicide from murder to manslaughter (See State v. Creighton, 330 Mo. 1176, 52 S.W.2d 556, 561; State v. Porter, 357 Mo. 405, 208 S.W.2d 240, 243; State v. Edwards, Mo.Sup., 226 S.W.2d 592; State v. Finn, Mo.Sup., 243 S.W.2d 67, 72[12] [13]); or (2) whether defendant was requesting an instruction on manslaughter on the basis of one of the exceptions to the above rule, (a) as where defendant acts in defense of his property or habitation or (b) where he comes upon one engaged in illicit sexual conduct with a near female relative of defendant. See State v. Haynes, Mo.Sup., 329 S.W.2d 640, 646; State v. Bongard, 330 Mo. 805, 51 S.W.2d 84, 89; State v. Wright, Mo.Sup., 336 S.W.2d 714, 717. The record in this case contains evidence relating to each of these three grounds.

■ It would serve no useful purpose to minutely review the testimony in this record to demonstrate our view that the trial court did not err in failing to instruct on manslaughter on either of the three grounds because we may not forecast what other evidence may be adduced upon a retrial of this cause. However, to support our conclusion that the assignment is insufficient to comply with Supreme Court Rule 27.20, we may say that defendant's testimony tended to show that he had known the deceased for some time and met him at the Bluebird Tavern on the afternoon of November 6, 1961, and that they left there in defendant's truck, with deceased driving, and made several further stops for beer on the way home. Before they reached home they stopped and drank from a bottle of Vodka and deceased told the defendant of certain indecent liberties he had taken with the defendant's fourteen-year-old stepdaughter, Judy, and of his having had sexual relationship with defendant's wife on several occasions. During these conversations deceased exhibited a short-barrel, loaded revolver, .38 caliber, and told defendant that it cost $38. He laid it on defendant's lap. Defendant also testified about getting into "a little squabble" about who should drive the truck and also about deceased requesting defendant to leave his wife and let deceased have her. Defendant testified that while they were both seated in the cab of the truck "we went to blows" and that deceased wanted to fight. How much "hot blood" arose as a result of these "blows" does not appear, nor does it appear who was the aggressor in this matter or how much the physical contest amounted to. Defendant testified that when he raised up in protest deceased threatened him with the revolver. Defendant then said: "Boy, if you will put your gun down, we will walk out in the road and I will thump you." In any event, the two proceeded to stop at two further taverns for beers and then went on to defendant's home, where they took seats together on the divan. Also it appears that defendant rested a couple of times on the foot of the bed and also went out on the back steps of the trailer "to get some air." Further, it does not appear from the defendant's testi-

mony or other evidence that defendant did not initiate these "blows", the inference is that he did, nor does it appear that deceased's use of his pistol created any "hot blood" resulting in deceased's death. See State v. Robinson, 353 Mo. 934, 185 S.W.2d 636, 639, 641; State v. Haynes, supra, 329 S.W.2d 640, 645; State v. Martin, Mo.Sup., 336 S.W.2d 394, 398; State v. Crouch, Mo. Sup., 124 S.W.2d 1185, 1187; State v. Smith, Mo.Sup., 240 S.W.2d 671, 674; State v. Kizer, 360 Mo. 744, 230 S.W.2d 690, 691 and State v. Finn, supra, 243 S.W.2d 67, 72 [12] [13].

As to the second possible basis for such an instruction, defendant testified that, after they had entered the trailer and were seated on the divan, with the deceased between the defendant and Judy, the deceased was playing with Judy's leg and taking improper liberties with her and defendant punched him in the ribs and told him not to do so and "to act like a man." According to defendant's evidence this conduct did not bring about the shooting. However, defendant further testified that while defendant was outside the trailer he looked in and saw deceased standing behind defendant's wife, who was standing by the sink fixing dinner. Defendant could see the back part of deceased moving in and out and deceased's trousers were unzipped and his privates visible. There is no suggestion of any adultery at this particular time since defendant saw his wife using a dish rag at the sink and heard her say, "if you don't get back I will throw hot grease on you." Defendant then saw the deceased voluntarily stop his activity, put his privates back in, zip up his pants, and go back to the divan and resume his seat by Judy, watching television. After this defendant came into the trailer and lay upon the bed. Earlier in the evening he had heard of much worse conduct by the deceased. Defendant offered no testimony tending to show that the killing was the product of passion inspired by what he saw going on before his eyes. The facts distinguish this case from

State v. Davis, Mo.Sup., 328 S.W.2d 706, 709.

Defendant further testified that twice during the evening after they had arrived at the trailer he had told deceased to leave and the deceased pulled the gun on him and when deceased got up from the divan defendant went to the back of the trailer and sat on the back steps. The first time defendant did not have his shotgun with him. The second time defendant didn't go out. Defendant testified: " * * * when I got to the door that goes out, I looked back and he is still sitting there and I stopped and I thought, well, I will get my gun. You have been playing guns all night. I will scare you out." Defendant also testified: " * * * so I run to the back of the trailer and I looked back and he was still sitting there, so I reached in the closet and got my gun and I went up and I said, 'Damnit, I told you I want you to go—go!', and Velma told him to go again, and I said, 'Go!', and I pushed my gun barrel up in front where he could see it and then he pulled his gun there and I knew that he wasn't going to sit there all night with a gun in his hand and me with mine. One of us was going to get it", so defendant shot the deceased while he was sitting on the divan. Deceased's simple failure to depart cannot, under the circumstances shown, be the basis for a manslaughter instruction. State v. Brookshire, Mo.Sup., 353 S.W.2d 681, 691–692. The mentioned assignment of error was clearly insufficient.

■ Error is also assigned in permitting the Coroner of St. Louis County, a mortician, to testify as to the cause of deceased's death since the witness was not a qualified medical expert. No prejudicial error was committed in permitting this testimony in view of the facts concerning the injuries received and defendant's subsequent testimony that he killed the deceased by shooting him with a shotgun. Defendant could in nowise have been prejudiced by this testimony. See State v. Foster, 355 Mo. 577,

197 S.W.2d 313, 325; State v. Truster, Mo. Sup., 334 S.W.2d 104, 109.

■ Error is further assigned on the admission of plaintiff's Exhibit 7, a photograph of the deceased shown seated on the divan after his death. Defendant had testified that, at the moment he shot the deceased, the deceased was holding a pistol in his hand and that deceased's hand was "laying right on the divan right beside him." State's Exhibit 7, taken after the shooting and before the body had been disturbed, shows both of deceased's hands resting in his lap. Defendant contends the photograph was improper in rebuttal and that the exhibit was inflammatory and prejudicial and shed no light on the issues of the case. After defendant's objection the court ordered the exhibit modified by covering the portion showing the wounds on the body and, as modified, the exhibit was received in evidence. The exhibit was properly admitted since it tended to impeach defendant's testimony. See State v. McDaniel, 336 Mo. 656, 80 S.W.2d 185, 193[5]; State v. Laspy, Mo.Sup., 298 S.W.2d 357, 361[7–9]; State v. Finn, supra, 243 S.W.2d 67, 70[3].

■ The final assignments state that the court committed prejudicial error in giving Instruction No. 3 because the instruction "erroneously stated to the jury the offense of murder in the second degree" and that the court erred in giving Instruction No. 4 on self defense, since the instruction "did not fully acquaint or instruct the jury as to the defense of self defense and deprived the defendant of a fair and impartial consideration of self defense by the jury." These assignments are insufficient to comply with Supreme Court Rule 27.20. However, Instruction No. 3 is supported by State v. Richardson, Mo.Sup., 321 S.W.2d 423, 427; and State v. Myers, 221 Mo. 598, 613, 121 S.W. 131, 135.

■ The fourth paragraph of Instruction No. 4 stated: "But before you acquit on the ground of self-defense you ought to be *satisfied* that defendant's cause of fear for his life or personal safety was reasonable. Whether the facts constituting such reasonable cause have been *established* by the evidence you are to determine, and unless the facts constituting such reasonable cause have been *established* by the evidence in this case, you cannot acquit the defendant on the ground of self-defense, even though you may believe the defendant thought he was in danger." (Italics ours.)

While the assignment in the motion for a new trial is insufficient to comply with Supreme Court Rule 27.20, nevertheless since the cause must be retried we should call attention to the fact that, although Instruction 4 substantially follows the wording of the self-defense instruction in State v. Sebastian, 215 Mo. 58, 114 S.W. 522, 527, 530; State v. Eaton, 355 Mo. 164, 195 S.W. 2d 457, 459; and State v. Porter, supra, 208 S.W.2d 240, 242[2], nevertheless, Instruction 4 in its fourth paragraph does employ some language held prejudicial in State v. Davis, 342 Mo. 594, 116 S.W.2d 110, 111 and in State v. Robinson, Mo.Sup., 255 S. W.2d 798, 799. In the Robinson case this court held that the use of the words "satisfied" and "established" in such an instruction would lead the jury into thinking that it was necessary for them to find that defendant had *"established"* his defense of self defense in order to acquit him on that ground, when, in fact, the burden always remained on the State to prevail on the issue of self defense beyond a reasonable doubt. In the event of another trial the instruction should be modified to conform to the recent decisions of this court.

For the error of the court in admitting the transcript of the testimony of Mrs. Elizabeth Orsech, as hereinbefore stated, the judgment is reversed and the cause remanded.

All of the Judges of the Division and STONE, Special Judge, concur.