STATE of Missouri, Respondent,

v.

Eugene HOLT, Appellant.

No. 61260.

Supreme Court of Missouri,
En Banc.

Jan. 15, 1980.

Rehearing Denied Feb. 11, 1980.

James E. Reeves, Caruthersville, for appellant.

John Ashcroft, Atty. Gen., Richard F. Engel, Asst. Atty. Gen., Jefferson City, for respondent.

SEILER, Judge.

Patricia Joye Holt was found murdered in her home in Bragg City, Missouri on November 23, 1976. In force on that date were § 559.005, RSMo 1975 Supp., defining the crime of capital murder [1] and § 559.020, RSMo 1969, defining second degree murder. Defendant, husband of the victim, was charged by amended information that he "did then and there willfully, unlawfully, knowingly, deliberately, feloniously, premeditatedly, and of his malice aforethought kill one Patricia Joye Holt by offering to pay one Roger Dale Jackson One Thousand Dollars ($1000.00) to kill Patricia Joye Holt and by providing Roger Dale Jackson with

---

1. The death penalty provisions for this crime were held unconstitutional in *State v. Duren*, 547 S.W.2d 476 (Mo. banc 1977), before appellant was tried. In the same decision, the alternative punishment directed by the legislature in the event that the death penalty were held unconstitutional—life imprisonment without eligibility for probation or parole for fifty years—was upheld.

a handgun and the said Roger Dale Jackson at the direction of defendant on the 23rd day of November, 1976 . . . did after accepting defendant's offer, make an assault upon the said Patricia Joye Holt with a loaded handgun inflicting a mortal wound from which she died . . . ."

Defendant, tried before a jury, was convicted of second degree murder, sentenced to life imprisonment and appeals. Since a life sentence was imposed, we have jurisdiction, Mo.Const. art. V, § 3, as amended August 3, 1976, effective January 2, 1979.

Defendant on appeal (hereinafter "appellant"), raises a number of points, the disposition of which requires first a statement of the facts, taken from the standpoint of those supporting the verdict.

So viewed, there was evidence of the following before the jury: appellant, thirty-five years old, and his wife operated a small grocery store. Appellant became infatuated with a sixteen year-old, Wanda Sue McAllister. Early in 1976, they became lovers. Appellant several times said he was going to kill his wife, mentioning drowning her, shooting her, rigging the bathtub so she would be electrocuted, and hiring someone to kill her. Roger Dale Jackson, age twenty, a cousin of Wanda, and not overly bright, testified that appellant offered to pay him $1000 to kill Mrs. Holt and also said he would forget about Jackson's unpaid bill at the grocery store.

The Saturday before the killing appellant took Jackson home with him, showed him the gun to use, and told him that the following Tuesday was the day. On Tuesday afternoon, Jackson met appellant at an agreed location behind a school house. Appellant again took Jackson to the house, gave him a handgun, told him where to wait and how his wife would enter the house, and instructed him to drag the body into the bathroom, douse the clothing and bathroom with lighter fluid, turn on the gas

stove and leave. Appellant would attend a basketball game at Neeleyville, some fifty miles or so away, and return after it was all over.

Jackson waited for Mrs. Holt, shot her four times in the back, ran out the back door, went home and told his wife what he had done and hid the gun in the attic. Shortly thereafter Jackson pleaded guilty to second degree murder on the understanding he would receive a twenty-five year sentence and would testify against appellant.

Appellant testified in his own behalf and admitted his infatuation and affair with Wanda McAllister, but denied having anything to do with killing his wife, with having hired Jackson to do so, or taking Jackson to the house. It was appellant's position that Jackson was a border-line mental defective, that he was angry with Mrs. Holt because she had refused him a sandwich and soft drink at the grocery store because of his unpaid bill and that his cousin, Wanda, was the one who persuaded him to shoot Mrs. Holt.

I

Appellant's first point is that the court erred in overruling his motion for judgment of acquittal because the conviction of second degree murder is without evidence to support it; that appellant was charged with a "contract murder" in violation of the capital murder statute; that the finding of guilty as to second degree murder constitutes an acquittal of capital murder and there is no rationale or factual basis under the facts whereby appellant could not have been guilty of capital murder, but guilty of second degree murder.

The jury was given three choices by the instructions: guilty of first degree murder,[2] guilty of second degree murder, and not guilty. Appellant argues that if he hired his wife's killer he is guilty of capital mur-

---

**2.** It is unexplained and no point is made of why the instruction referred to first degree murder rather than capital murder. The instruction, No. 5, is marked as MAI–CR 6.06 being its source. MAI CR 6.06 is the approved instruc-

tion for second degree murder, so there was some kind of mixup as to the MAI–CR reference. Instruction No. 5 as given, however, actually corresponded to MAI–CR 6.02, which is the required capital murder instruction.

der; that if he did not, he is innocent; that the jury has, in effect, acquitted him of capital murder and hence found he did not arrange the death of his wife and so he cannot be guilty of second degree, either.

It does not follow that by not finding defendant guilty of capital murder the jury did not believe that he arranged the shooting of his wife. The jury could have believed he did, indeed did so believe as shown by instruction No. 6, which set forth what was required to be found to convict of second degree murder, yet decided it would convict him of second degree, not capital, murder. We could speculate that this was because the jury was aware the person who did the shooting, Roger Dale Jackson, pleaded guilty to second degree murder and received a sentence of twenty-five years, and was also aware that on conviction of capital murder (or first degree murder as the instruction put it), the only sentence available would have been life imprisonment without possibility of parole for fifty years. Whatever the reason, the jury had a right to convict on either the capital murder or second degree murder charge, provided there was evidence before the jury to support such a conviction.

This case does not present the problem we addressed in *State v. Handley*, 585 S.W.2d 458 (Mo. banc 1979). In *Handley* the two crimes covered by the two principal instructions were different as to intent—in the felony murder instruction, no intent to commit an assault was required, whereas in the second degree murder instruction (on which the jury convicted) there had to be an intent to assault the particular guard who was killed. Therefore, if Handley were not guilty of aiding or abetting in the bank robbery (which was the only basis on which he could have been acquitted of that crime under the facts), then he could not be involved in aiding and abetting the assault, because his only connection with the entire affair had to be based on his aiding and abetting the bank robbery (as to which the jury found otherwise).

But in the case at bar, an intent to aid and abet in an assault on the victim was required in both the instruction on capital murder and on second degree murder, although there was a difference as to the intensity or extent of intent between the two. Hence, not finding appellant guilty of capital murder does not foreclose a finding of the necessary intent for second degree murder, conviction of which would permit the jury more flexibility as to punishment. If the jury decides to be lenient under these circumstances, it does not mean it is being inconsistent or that its verdict is without factual basis.

■ As to whether there was evidence to support a finding of guilt under the instruction submitting second degree murder in the case at bar, the instruction, which was MAI–CR 6.06, required the following:

"If you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree.

"As to murder in the second degree, if you find and believe from the evidence beyond a reasonable doubt:

"First, that on the 23rd day of November, 1976, in the County of Pemiscot and State of Missouri, the defendant caused the death of Patricia Joye Holt by offering to pay one Roger Dale Jackson One Thousand Dollars ($1000.00) to kill Patricia Joye Holt and by providing Roger Dale Jackson with a handgun, and

"Second, that the defendant intended to take the life of Patricia Joye Holt, and

"Third, that the defendant did not do so in anger, fear or agitation suddenly provoked by the unexpected acts or conduct of Patricia Joye Holt, and

"Fourth, that the defendant acted either alone or knowingly and with common purpose together with one or more others in the conduct referred to in the above paragraphs, then you will find the defendant guilty of murder in the second degree."

There was ample evidence to support each required finding. Jackson testified appellant offered him money to kill Mrs. Holt and provided him with a gun to do so. Jackson, his wife and McAllister each testi-

fied to expressions by appellant over a period of time that he intended to kill his wife. McAllister testified appellant told her how Jackson was to do it. It is evident that appellant did none of the foregoing in anger, fear or agitation suddenly provoked by the unexpected acts or conduct of his wife; appellant was not even present. And finally, there was ample evidence that appellant acted knowingly and with common purpose with Jackson in the conduct referred to in the earlier paragraphs of the instruction.

So it is not correct that there was no evidence to support a finding of guilt of second degree murder and the contention to the contrary is overruled.

## II

■ Appellant's second point is that he is entitled to a judgment of acquittal on the ground that the evidence showed that Wanda Sue McAllister caused the fatal shot to be fired and that there is no evidence that he caused the death of his wife. Jackson testified that after appellant left the house, Jackson called McAllister on appellant's telephone while he waited for Mrs. Holt to get home. Jackson also testified that McAllister urged him not to miss and that he would not have killed Mrs. Holt had it not been for this urging by McAllister just minutes before Mrs. Holt arrived home.

There was sufficient evidence for the jury to find that appellant caused the death of Mrs. Holt. He hired Jackson to kill her, let Jackson into the house, gave Jackson the gun, and instructed Jackson on how he wanted the murder accomplished. Appellant had also convinced McAllister to go along with this plan after she first objected to involving Jackson, her cousin, in the plan. It was foreseeable that McAllister would urge Jackson to do as appellant instructed him to do.

There is a clear causal relation between appellant's conduct (providing Jackson with the incentive, plan and means for killing Mrs. Holt), and the criminal result (the death of Mrs. Holt). Appellant's conduct was the cause which, operating in a natural and continuous sequence, produced the intended illicit result. McAllister's support for the plan, which appellant had solicited, was not an independent or unforeseeable intervening cause of Mrs. Holt's death which would relieve appellant of liability for the result of his criminal acts, but rather was a foreseeable result of appellant's efforts to achieve the intended murder. Under these circumstances, the evidence established criminal causation. *See State v. Glover*, 330 Mo. 709, 50 S.W.2d 1049 (1932); M. Bassiouni, Substantive Criminal Law at 191–92 (1978).

## III

Appellant alleges two grounds of error in the admission of the transcript of Wanda McAllister's testimony at the preliminary hearing after McAllister, at the trial, exercised her fifth amendment privilege against self-incrimination and refused to testify. First, appellant contends that the admission of the transcript denied him the right to confront and cross-examine McAllister in violation of the sixth and fourteenth amendments as enunciated in *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). Second, appellant contends that because the transcript was not certified by the magistrate and signed by the witness in accordance with Rule 23.11 and Rule 23.12, its admission constituted reversible error. Neither contention presents grounds of reversible error.

## A

■ The sixth amendment guarantee that "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." is applicable to all criminal proceedings in state courts under the fourteenth amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). An exception to the confrontation requirement exists where a witness is unavailable and has given testimony which was subject to cross-examination at previous judicial proceedings against the same defendant. *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255; *State v. Murphy*, 592

S.W.2d 727 (Mo. banc 1979). "This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement." *Barber v. Page*, 390 U.S. at 722, 88 S.Ct. at 1320.

■ In *State v. Phillips*, 511 S.W.2d 841, 847 (Mo.1974), we held that for the purpose of admitting into evidence prior testimony under this limited exception to the confrontation requirement, a witness is "unavailable" by reason of asserting his privilege against self-incrimination. Accordingly, in the case at bar, Wanda McAllister was unavailable as a witness once she asserted her privilege against self-incrimination. Appellant's able counsel cross-examined this witness at the preliminary hearing and appellant thus was afforded substantial compliance with the purposes behind the confrontation requirement. It was not error under the confrontation requirement, therefore, for the trial court to admit into evidence McAllister's previous testimony from the preliminary hearing.

### B

■ The transcript of McAllister's testimony was not certified by the magistrate and signed by McAllister in accordance with Rule 23.11 and Rule 23.12.[3] Appellant asserts that under *State v. Luttrell*, 366 S.W.2d 453 (Mo.1963), the admission of the preliminary hearing transcript without compliance with these rules constituted prejudicial and reversible error. In the *Luttrell* case, as here, the transcript was neither certified or signed. In *Luttrell*, however, unlike the circumstances in the instant case, the defendant objected to the introduction of the transcript into evidence on the ground that it was not a true and correct transcript. The disputed testimony in *Luttrell*, which the defendant had asserted was inaccurately recorded, directly contradicted his testimony. Moreover, in *Luttrell* the Court specifically found that the admission of the disputed transcript was prejudicial to the defendant.

In the case before us, appellant has not challenged the transcript on the ground that it is not a true and correct transcript of the testimony at the preliminary hearing and there is no dispute as to whether McAllister made the statements. The official court reporter who transcribed the testimony at the preliminary hearing identified the transcript and attested to its truth and accuracy. In *State v. Banton*, 342 Mo. 45, 111 S.W.2d 516, 518 (1937), this court held that the purposes of the certification and signature requirements were to secure a fair preliminary examination and to preserve the testimony taken. In this case there is no challenge to the fairness of the preliminary hearing nor is there a charge that any of the testimony taken was not preserved. Appellant does not show noncompliance with the rules resulted in any prejudice.

In *State v. Phillips, supra*, this court permitted oral testimony of a person who heard and remembered the previous testimony of a witness unavailable to testify in the second proceeding. In the case at bar, the transcript of McAllister's testimony, which appellant does not challenge on the basis that it is not a true and correct account of McAllister's testimony, presents more reliable evidence than the oral testimony permitted in *Phillips*. Except for the certification and signature requirements under Rules 23.11 and 23.12, the admission of the transcript in lieu of testimony from the unavailable McAllister was otherwise proper and no prejudice has been alleged by appellant to have resulted from noncompli-

---

**3.** Rule 23.11 provides in part:

"Upon the completion of preliminary examination, if the defendant be bound over to answer a felony charge, all papers in connection with the hearing shall be *certified by the* magistrate or the clerk of the court in which the *offense is cognizable, within ten days . . . ."*

Rule 23.12 provides:

"In all cases of homicide, the evidence given by the witnesses [at the preliminary hearing] shall be reduced to writing by the magistrate, or under his direction, and shall be signed by the witnesses respectively."

ance with the rules. In this case, noncompliance with the rules was error without any accompanying prejudice and the admission of the transcript of McAllister's testimony did not constitute reversible error.

## IV

Appellant alleges several grounds of error in the trial court's overruling of his motion to quash the jury panel. A hearing was held on the morning of the trial on appellant's motion to quash the special jury panel. The circuit clerk testified at the hearing that the regular panel for the September term of court was chosen thirty days prior to the new term. Twenty-four regular and twenty-four alternate jurors were called. Twelve jurors could not be found and, of the remaining thirty-six called, sixteen jurors were excused for good cause. The trial judge then ordered the sheriff to select a special jury of twenty-five additional jurors. The record does not indicate whether the sheriff was given an oath prior to the summoning of the special jury. The court overruled appellant's motion to quash the special jury panel but afforded defense counsel sixteen peremptory challenges in the jury selection, four more than directed by § 546.180, RSMo 1978, with thirty-seven jurors remaining after seven jurors had been stricken for cause. The state was afforded eight peremptory challenges.

## A

■ Appellant contends that because the circuit judge excused from the regular panel sixteen jurors "for good cause shown", the sheriff's selection of jurors substituted in large part for the statutory mandate of random selection of jurors. Appellant alleges that the circuit judge improperly excused some jurors who did not meet the statutory justifications for excuse in § 494.031 RSMo 1978. At the hearing on appellant's motion to quash the special jury panel, the circuit clerk read the applications of the jurors who sought to be and were excused from jury service. Each of the sixteen applications indicates that the jur-

ors did meet the statutory justifications for excuse and that the circuit judge properly excused the sixteen jurors. The regular panel of jurors was properly exhausted before the judge ordered the sheriff to summon the special panel. In any event, the statute "[is] merely directory and not mandatory" and appellant must "show that he has been prejudiced or that his interests have been adversely affected by failure to strictly observe these statutory provisions" in alleging error on the part of the circuit judge. *State v. Thompson*, 472 S.W.2d 351, 353–54 (Mo.1971). Appellant has not shown that the circuit judge failed to comply with the statute, let alone that such failure resulted in prejudice or adversely affected his interests.

## B

■ Appellant next contends that the selection of the special jury of twenty-five additional jurors by the sheriff gave the state an unfair advantage and violated his constitutional right to a fair trial on the ground that the sheriff has an interest in attaining convictions and will choose jurors who are likely to convict. Appellant cites *State v. Langley*, 342 Mo. 447, 116 S.W.2d 38 (1938), a case addressing the question whether a deputy sheriff is disqualified from serving as a juror when the sheriff is a witness for the prosecution. The language cited by appellant discusses whether the deputy sheriff can be impartial *as a juror* :

"A deputy sheriff, under the circumstances, cannot be said to be impartial. It is obvious that he might be interested in a conviction because of the additional fees and prison board the sheriff might thereby collect. He might be interested because his own salary might, if so agreed, depend upon the number of convictions, as is often the case, in certain counties. His loyalty to his chief and fellow deputies would certainly have its weight. The likelihood exists that he had become conversant with the facts in the case, and was more or less convinced as to the guilt of defendant. . . ."

116 S.W.2d at 38, citing *State v. Golubski*, 45 S.W.2d 873 (Mo.App.1932). *Langley* did not consider the question presented in the case at bar, whether a sheriff's selection of special jurors on a circuit judge's order, after the number of jurors available from the regular panel proved inadequate, violated appellant's right to a fair trial.

None of the factors which the *Langley* court found to make the deputy sheriff partial apply to the facts of the case at bar. Appellant was arrested in Pemiscot County, where the murder occurred. The trial took place in New Madrid County. The sheriff in New Madrid County had not been engaged in the investigation or arrests in the case and had no apparent interest in convicting appellant. Since the sheriff and his deputies were not involved in this case prior to trial, there was no question of the sheriff acting out of loyalty to deputies or on the basis of special knowledge of the facts of the case.

Appellant also cites the court to *Ross v. Wyrick*, 581 F.2d 172 (8th Cir. 1978), as authority for his contention that the selection of jurors by the sheriff deprived him of his right to a fair trial. In *Ross*, the Eighth Circuit held that the disparity in representation of black persons on jury panels sufficient to sustain a prima facie case of jury discrimination was not overcome by the sheriff's selection of additional black jurors. *Ross* addressed the issue of an exclusion of an identifiable segment of the community. In the case at bar, appellant does not assert jury discrimination for lack of any racial, religious, age or gender group on the panel, nor alleges that the sheriff actually discriminated in the selection of jurors.

Appellant merely asserts the opportunity for discrimination deprived him of a fair trial without showing jury discrimination or prejudice in the selection of the jury. On the record, we cannot conclude that appellant was denied a fair trial because the sheriff selected the special jurors.

### C

Appellant's third ground for challenging the jury panel alleges that the sheriff failed to take the oath required by § 494.070, RSMo 1978, to summon an impartial jury. At the hearing on appellant's motion to quash the jury panel, the circuit clerk testified that he did not administer the oath to the sheriff before the sheriff summoned the special jurors. In *State v. Riddle*, 179 Mo. 287, 78 S.W. 606 (1904), the court addressed this issue:

"It is not claimed that the sheriff or any of his deputies were guilty of any partiality or improper conduct in summoning the jury, and, as the statutes with respect to impaneling juries in criminal cases are directory, merely, even if they are disregarded that will not be the ground for a new trial, in the absence of circumstances from which it can be inferred that some prejudice resulted to defendant by reason thereof."

78 S.W. at 607. Since *Riddle*, this court has continuously held that failure to observe these provisions strictly does not provide a ground for a new trial absent a showing of accompanying prejudice. *State v. Thompson, supra*, at 353–54. In the case at bar, there is no claim that the sheriff or any of his deputies were guilty of any partiality or improper conduct. Appellant has not shown that he was prejudiced by the failure of the clerk to administer the oath to the sheriff before the selection of the special jurors. Appellant's claim of reversible error in the selection and impaneling of the jury is overruled.

### V

Appellant next contends that jury instruction No. 6, MAI–CR 6.06 submitting second degree murder, failed to submit the essential element that Roger Dale Jackson did, in fact, shoot and kill Patricia Joye Holt at the direction of appellant. The first element of instruction No. 6, which is fully set out in the first part of this opinion, reads:

"First, that on the 23rd day of November, 1976, in the County of Pemiscot and State of Missouri, the defendant caused the death of Patricia Joye Holt by offering to pay one Roger Dale Jackson One

Thousand Dollars ($1000.00) to kill Patricia Joye Holt and by providing Roger Dale Jackson with a handgun, . . ." Appellant claims that this alleged omission constitutes reversible error.

The MAI–CR 6.06 form directs that this element of the instruction be presented as follows:

"First, that (on) (on or about) _____ in the (City) (County) of _____, State of Missouri, the defendant caused the death of [*name of victim*] by [*insert such words as shooting, stabbing, cutting, striking, without further description*] him, . ."

The question presented, then, is whether the words "offering to pay one Roger Dale Jackson One Thousand Dollars ($1000.00) to kill Patricia Joye Holt and by providing Roger Dale Jackson with a handgun" were properly inserted as "such words as shooting, stabbing, cutting, striking, without further description . . ." called for by the MAI–CR 6.06 instruction form. We hold that this instruction, given the facts and evidence of the case, was proper.

During the trial the judge read the following stipulation to the jury: "The State of Missouri and the Defendant have agreed to stipulate and do hereby stipulate and agree that the cause of death of Patricia Joye Holt was the result of gunshot wounds." "It is a well-settled general rule of law that facts which are stipulated during the course of a trial are to be taken by the jury as conclusively proven." *Jackson v. United States*, 330 F.2d 679, 681 (8th Cir.), *cert. denied*, 379 U.S. 885, 85 S.Ct. 105, 13 L.Ed.2d 58 (1964); *see also State v. Jones*, 549 S.W.2d 925 (Mo.App.1977). Accordingly, the fact that Mrs. Holt died of gunshot wounds was already conclusively proven and it was not necessary to submit this fact to the jury. The only fact remaining for the jury was whether Roger Dale Jackson was the person who killed Patricia Joye Holt, a fact not disputed at the trial. This fact the jury necessarily found against appellant, as the jury convicted him of second degree murder for offering to pay Jackson and providing him with the hand-gun to kill Mrs. Holt. Appellant's contention to the contrary is overruled.

VI

Appellant contends that the trial court erred in allowing the prosecutor to cross-examine appellant pertaining to matters disclosed during conversations with Wanda Sue McAllister over a wiretapped telephone after appellant had been bound over for trial and while represented by counsel. Appellant claims that the telephone conversations constituted interrogation in the absence of counsel and were obtained in violation of both the right to counsel guaranteed by the sixth amendment and the Federal Communications Act, 47 U.S.C. § 605 (1976).

Wanda Sue McAllister cooperated with the police and prosecutor from the day after the murder until shortly before trial. The prosecutor had told her that if she told him everything and cooperated fully, she would not be prosecuted. She agreed to testify against appellant and informed him of this fact. McAllister reported to the prosecutor all conversations she had with appellant.

McAllister, as noted above, testified against appellant at the preliminary hearing. Appellant continued to call McAllister on the telephone and he continued to see her. After the preliminary hearing, several officers visited McAllister at the request of the prosecutor and asked her permission to place a wiretap on a telephone at her grandparents' home, where she lived. She agreed. Her grandparents were aware of the wiretap and did not object to it. Several tapes were made of the conversations with appellant; all but one of these were unintelligible. McAllister continued to tell the prosecutor the substance of her conversations each time appellant called her. The officers again visited McAllister and placed the wiretap device on a different telephone. Shortly thereafter, a clear tape of appellant's conversation with McAllister was made.

Prior to trial, appellant's motion to suppress the tape was overruled. The tape, however, was not introduced into evidence

or played for the jury at the trial. We have examined the transcript of the tape from the hearing on appellant's motion to suppress. It is not clear whether any information on the tape was used by the prosecutor in cross-examining appellant nor is it clear whether the prosecutor learned anything more than the information he had already learned from his previous interviews with McAllister. The thirty-seven page transcript of the telephone conversation reveals a rambling conversation with appellant doing most of the talking. McAllister does not ask appellant questions which would lead to incriminating statements. The two do discuss the fact that McAllister will testify at the trial against appellant and that the exposure of their ongoing relationship would reflect adversely on appellant at trial.

### A

█ Appellant contends that McAllister's conversation with him over the wiretapped telephone represented an interrogation in the absence of counsel in violation of the sixth amendment, citing *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and *State v. Witt*, 422 S.W.2d 304 (Mo.1967). In *Massiah*, the Supreme Court held that the petitioner's sixth amendment guarantee was violated when "federal agents had deliberately elicited [incriminating statements] from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206, 84 S.Ct. at 1203. Just recently, the Supreme Court reaffirmed the holding of *Massiah* in *Brewer v. Williams*, 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977): "[T]he clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." It is clear under *Massiah* and *Williams* that before a defendant's rights under the sixth amendment are violated there must be an interrogation by or at the direction of government agents.

█ In the case at bar, it was appellant who called McAllister. He knew that she had already testified against him at the preliminary hearing. He knew that she was still cooperating with the prosecution and that she had agreed to testify against him at trial. Appellant called her knowing that the prosecutor, fearful that appellant would convince McAllister to refuse to testify at trial, was upset with the fact that McAllister was still seeing appellant. As noted above, the transcript of the telephone call does not indicate that McAllister surreptitiously elicited incriminating statements from appellant. Appellant cannot complain on the sole ground that McAllister permitted the state to intercept the telephone conversation.[4] We conclude that there was no interrogation in the absence of counsel by or at the direction of a government agent in this case. Appellant's reliance on the federal cases, *Massiah* and *Williams*, and on the Missouri cases, *State v. Witt*, 422 S.W.2d 304 (Mo.1967), *State v. Peters*, 545 S.W.2d 414 (Mo.App.1976), is misplaced.

### B

█ Appellant also contends that the telephone wiretap violated the Federal Communications Act, 47 U.S.C. § 605 (1976), which prohibits the recording of telephone conversations without the consent of one of the parties to the conversation, on the ground that McAllister was seventeen years old and thus incapable of giving legal consent. Appellant cites *United States v. Napier*, 451 F.2d 552 (5th Cir. 1971), as authority for this proposition. In *Napier*, the consenting party to the telephone conversation, a former mental patient, had been found mentally incompetent to testify as a witness at trial but the trial court permitted the prosecution to admit into evidence telephone conversations that the mental incom-

---

**4.** "One party to a telephone communication has no right to force the other to secrecy, and, in fact, takes the risk that the other party may have an extension telephone and may allow another to overhear the conversation. . . . [citations omitted]" *Coates v. United States*, 307 F.Supp. 677, 679 (E.D.Mo.1970).

petent had recorded. The Fifth Circuit vacated the conviction of the defendant and remanded the case to the trial court for an evidentiary hearing on the capacity of the mental incompetent to consent to the wiretap. There being no suggestion in the record of the instant case that McAllister is mentally incompetent, the *Napier* case is inapplicable to the disposition of this question.

The Federal Communications Act does not provide that persons under the age of majority are incapable of consenting to the interception of telephone conversations, nor are we aware of any cases so holding. McAllister was seventeen years old when she consented to the wiretap. During the hearing on the motion to suppress, the judge was able to ascertain McAllister's maturity and capacity to consent, as McAllister was extensively cross-examined by appellant's counsel at the hearing. Additionally, McAllister's grandparents, whose telephone was actually wiretapped, knew of and did not object to the wiretap. There is no evidence that the judge abused his discretion in overruling appellant's motion to suppress. Appellant's contention is overruled.

### VII

■ Appellant contends that the court erred in overruling his motion to be discharged by reason of double jeopardy arising from his being tried a second time after the court declared a mistrial and discharged the jury in his first trial before the jury had adequate and reasonable time to consider its verdict. Appellant's first trial took place at Poplar Bluff in Butler County on February 20, 1978. By agreement the parties have provided a supplemental transcript setting forth the proceedings between the time the jury retired to consider its verdict and the time it was discharged by the trial court.

The court held a night session and the jury retired to consider its verdict at 11:15 p. m. At 12:35 a. m. the jury returned and in response to the court's question as to whether they had a verdict or were back for some other reason the foreman replied, "We have a hung jury." The court then asked that the foreman state the numerical division without saying which way the vote was, to which the foreman replied: "Nine guilty—," whereupon the court cut him off and repeated that he wanted just a numerical division. The foreman said it was "Nine and three". In response to questions from the court, the foreman said the jury had been that way for the last hour and a half and that they had "gained one and lost one" in the last little bit. The court then inquired if the foreman felt "there is any possibility of reaching a verdict" to which the foreman answered: "No, sir, I sure don't. I don't think there is any chance." The court: "You have given up on that?" Answer: "Yes sir." The court then interrogated the remaining jurors, one at a time. Each one said he or she did not think there was any chance of a verdict, or words to that effect, and in response to the court's final question: "Does anybody on this jury think there is any possibility at all?", the foreman replied: "I sure don't." Whereupon, the court acted as follows: "Let the record show that the jury reported back in at 12:35 a. m. on Tuesday, the 21st of February, 1978, and after questioning each juror, the court declares this a mistrial and the jury is discharged and the cause is passed for a setting in the next term of court . . . ."

The record shows no objection, comment, or remark by either counsel for the state or counsel for appellant. The appellant takes the position that the action of the court was too hasty and done when there was no "manifest necessity" to terminate the trial; that the jury was not given an ample time to consider its verdict and that the appellant's right to "conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate," *United States v. Jorn*, 400 U.S. 470, 486, 91 S.Ct. 547, 558, 27 L.Ed.2d 543 (1971), was terminated by the trial judge in an abuse of discretion and that double jeopardy bars the present prosecution.

The state relies on *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), contending that the action of the trial judge in declaring a mistrial was within his broad discretion in deciding whether or not "manifest necessity" justified the discharge of the jury.

Thanks to the foreman's blunder, the trial judge found himself in a difficult situation. Knowing that the jury was nine to three against the appellant, for the court to return them for further deliberation would be a clear signal that the judge, who knew how they stood, thought they were on the right track. It would inevitably make appellant's three jurors doubtful and apprehensive about continuing to hold out. The appellant could, with justification, contend that sending the jury back at 12:45 or 1:00 o'clock in the morning, when the judge knew they were nine to three for conviction, was a tactic to give the state more leverage to convict the appellant. It would be different if the judge knew only that the jury stood nine to three, because then his attempt to bring about a verdict by requiring further deliberation would be made without the court's knowing which side would likely be the beneficiary of his action. Under the circumstances before him, the only way the court could avoid showing favoritism to the state was to declare a mistrial. His action was not over hasty or rash.

We note, too, that the impropriety here came from what the juror said, not from overreaching by the court or the prosecutor. The action taken by the court did not, in all probability, cost appellant a favorable outcome from the jury—the chance to "end the dispute then and there with an acquittal", *United States v. Jorn, supra,* 400 U.S. at 484, 91 S.Ct. at 557. On the contrary, the action of the court, this being a capital case carrying a life sentence without possibility of probation or parole for 50 years, was more in the interest of the appellant, than against it.

The state would have us rule the point against appellant on the ground appellant's counsel did not object to the mistrial. We do not believe it would be fair to make this disposition, which would have compelled counsel to take a desperate chance. The foreman's disclosure that the jury stood nine to three in favor of guilty left counsel, through no fault of his own, where if he objected to a mistrial and were sustained, the likely outcome of further deliberation would be a verdict adverse to his client. Failure to object under these circumstances was not a waiver of double jeopardy.

Even so, however, we are convinced that the circumstances under which the mistrial was declared in the first trial showed a manifest necessity to do so, that an impartial verdict could not be reached after what took place, that the trial judge acted within his sound discretion in declaring a mistrial, and that appellant is not being put in double jeopardy by his second trial. We therefore overrule appellant's contention on this point.

## VIII

Appellant alleges several points of error in the trial court's admitting the testimony of Roger Dale Jackson, who appellant contends was mentally incompetent to testify. Appellant also alleges error in the court's overruling of his motion for judgment of acquittal on the ground that the evidence supporting the conviction without the testimony of Jackson was insufficient as a matter of law.

Roger Dale Jackson entered a plea of guilty to second degree murder for killing Patricia Joye Holt and was sentenced to twenty-five years in the penitentiary in return for his promise to testify against appellant. He was eighteen years old at the time of the murder. Shortly after the crime, Jackson was administered an intelligence quotient ("I.Q.") test at the jail at the request of his attorney. The test result indicated that Jackson had an I.Q. of 59, which meant that he would be classified on the borderline between mentally deficient and mentally defective, assuming that the test were properly administered under appropriate conditions. Persons with an I.Q.

under 78 are normally classified as mentally retarded and persons with an I.Q. of 59 are given an approximate mental age of eight years old.

Before the trial, appellant challenged the testimonial qualifications of Jackson. When Jackson was called to testify, appellant's counsel was permitted extensive voir dire to determine the competency of Jackson. At this time appellant introduced the transcript of testimony of a Mr. Vernon Till, given at the first trial, wherein Till gave an account of his giving the I.Q. test to Jackson in December 1976, shortly after the crime. Till was later called as a witness to testify in greater detail as to the results of the test. The trial judge examined Till extensively. The state offered rebuttal evidence about three different I.Q. tests administered by a Mr. Larry Milligan to Jackson several months prior to trial, when Jackson was twenty years old. On the basis of these three tests, Milligan found that Jackson had a composite I.Q. of 81.

The trial court questioned Jackson carefully. Jackson assured him that he understood the truth and would testify truthfully. The court overruled appellant's objection to Jackson's testimonial competency upon a finding "that the witness is able to observe, recollect, and relate things which he has seen and is not a person of unsound mind."

### A

Appellant contends that since Jackson allegedly had a mental age of eight years old, Jackson was presumptively incompetent under § 491.060, RSMo 1978, which provides that a child under the age of ten is presumptively incompetent to testify. Appellant cites *State v. Dayton,* 535 S.W.2d 479 (Mo.App.1976), as authority for this point.

■■■ Section 491.060(2), RSMo 1978, the statutory provision pertaining to witnesses under the age of ten, does not apply to an adult who allegedly has a mental age under the age of ten. *McCrary v. Ogden,* 267 S.W.2d 670, 673 (Mo.1954). *State v. Dayton,* cited by appellant, applies the statute in considering the competency of a child

under the age of ten and has no application to the facts of this case. When presented with an objection to the competency of an adult who allegedly has a mental age under ten years old, a court must consider all available evidence, including mental age, to determine whether a witness is of sound mind at the time he is produced to testify. *McCrary,* 267 S.W.2d at 673.

■■■ In the case at bar, the trial court had ample opportunity to observe and question Jackson and the expert witnesses testifying as to his intelligence. Mr. Till, the witness who testified that Jackson's mental age was under ten, conceded that the jail, where the test was administered, was not a conducive atmosphere for maximum performance on the test and, in any event, Jackson had an incentive to do poorly on the test that his counsel had requested. Moreover, the state's expert, Mr. Milligan, contradicted Till and concluded that Jackson was not mentally retarded. After questioning Jackson the court found him of sound mind and competent to testify. The two experts testified before the jury and thereby alerted the jury to the issue of Jackson's credibility. We have studied the transcript and we conclude that the trial judge did not abuse his discretion in ruling Jackson was competent to testify.

### B

Appellant also objects to Jackson's testimony on the ground that testimony obtained by a reduction of charges and punishment presents the witness with a powerful incentive to fabricate, citing *State v. Brooks,* 513 S.W.2d 168 (Mo.App.1973). Appellant misreads the *Brooks* case. In *Brooks,* the conviction was reversed not because the testimony of a witness was obtained by a reduction of charges and punishment, but because the prosecution suppressed this information and led the defendant to believe that no promise to or agreement with the witness had been made. The court in *Brooks* indicates that the prosecution should have disclosed the agreement made; it did not hold that the agreement made the witness' testimony inadmissible.

■ It has long been the rule that when a witness is given lesser punishment for agreeing to testify, "such fact does not disqualify him as a witness, but may be shown as affecting the credibility of his evidence." *State v. Woods,* 346 Mo. 538, 142 S.W.2d 87, 90 (1940). In the instant case, the jury was informed of the circumstances of the prosecutor's acceptance of Jackson's plea and sentence in return for his testimony. The issue of Jackson's credibility was properly brought to the jury's attention.

### C

Appellant also asserts that Jackson's testimony was contradictory and inconsistent with three written statements he made prior to trial and was insufficient as a matter of law to sustain a finding that appellant was guilty beyond a reasonable doubt, citing *State v. Dayton, supra.* We have already noted that *Dayton* deals with the testimonial competency of a child under the age of ten and has no application to this case.

■ In *State v. Brager,* 497 S.W.2d 181, 182 (Mo.1973), this court held that a witness' credibility in view of discrepancies in his testimony is a matter for resolution by the jury. The credibility and weight of the testimony are for the jury to determine. *State v. Dodson,* 490 S.W.2d 92, 95 (Mo. 1973). A jury may believe all, some, or none of a witness' testimony in light of the facts, circumstances and other testimony of the case. *State v. Wynn,* 391 S.W.2d 245, 247 (Mo.1965). In the case at bar, Jackson's contradictory statements were fully disclosed to the jury. The jury was entitled to accept part of his testimony and reject other parts, given the evidence and other testimony supporting his account of appellant's involvement in the murder. Accordingly, the credibility and weight to be afforded to Jackson's testimony were properly given to the jury for resolution.

### D

■ Appellant also contends that Jackson's testimony was incompetent as the un-

corroborated testimony of an accomplice, citing *State v. Shelton,* 223 Mo. 118, 122 S.W. 732 (1909). Appellant misreads the *Shelton* case, as it supports the state's position. In *Shelton,* the court stated that "it is also accepted doctrine that the evidence of an accomplice, even though uncorroborated, is sufficient to sustain a conviction if believed by the jury." 122 S.W. at 738. Since *Shelton,* this court has "held many times that a defendant may be convicted on the uncorroborated testimony of an accomplice." *State v. Lang,* 515 S.W.2d 507, 509 (Mo.1974). In any event, almost all of Jackson's testimony was corroborated by the evidence and through the testimony of his wife, Margaret Jackson, and his cousin, Wanda Sue McAllister.

### E

■ Finally, appellant alleges that no rational trier of fact could believe that Jackson's testimony provided proof beyond a reasonable doubt of appellant's guilt, citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Appellant's conviction was supported by the testimony of Wanda Sue McAllister, Margaret Jackson, Roger Dale Jackson, the Pemiscot County sheriff, and other evidence found at the murder scene. Viewing the evidence in the light most favorable to the prosecution, no matter what standard of appellate review is applied, the evidence of guilt is strong and convincing. The trial court did not err in overruling appellant's motion for judgment of acquittal. It is not necessary, and we make no effort in this case, to determine whether the *Jackson* standard applies to a direct review by this court of a conviction.

### IX

Appellant next contends that the trial court erred in permitting the state to cross-examine him concerning specific acts of misconduct and intimate details of his relationship with Wanda Sue McAllister. Appellant contends that the prosecutor cross-examined him concerning his affair with McAllister in order to prejudice the jury against him.

Prior to appellant's testimony, counsel for appellant made a motion in limine to restrict the prosecutor from going into the details of appellant's sexual relationship with McAllister. The court instructed the prosecutor not to go into the "sordid details of the relationship" nor to "try to inflame the jury in any way." An examination of the record indicates that the court exercised sound discretion and kept the prosecutor within the bounds of relevancy and materiality.

Specifically, appellant's objections include the following questions:[5] "Were you in love with Wanda McAllister?" (to which appellant replied that he loved his wife and did not love McAllister); "On November the 20th, 1976, three days before your wife was murdered, did you take Wanda to the Hickory House Motel in Dexter?" (to which appellant replied that he did not remember); "Do you remember the last time before your wife was murdered when you went out with her?" (appellant's counsel objected to this question and appellant did not answer it); "Mr. Holt, did you go with Wanda McAllister to a motel on Saturday before your wife was murdered?" (to which appellant replied that he did); "Did you give Wanda McAllister an engagement ring?"; (to which appellant replied that he had given her a dinner ring); and, "Were you having an affair with anyone other than Wanda McAllister?" (to which appellant replied that he was not).

Appellant claims that it was reversible error for the court to permit the prosecutor to ask these questions, under *State v. Todd,* 468 S.W.2d 632 (Mo.1971) and *State v. Newman,* 568 S.W.2d 276 (Mo.App.1978). In *Todd,* it was held to be reversible error for the trial court to permit cross-examination relating to prior arrests of the defendant; in *Newman,* the prohibited cross-examination related to details of prior crimes, the length of time the defendant had served in prison and defendant's breach of parole.

These cases involved matters not at all relevant to the crime charged and highly prejudicial to the defendant, unlike the case at bar where the matters were relevant to appellant's motive in hiring Jackson to kill Mrs. Holt.

Wide latitude is generally allowed in the development of evidence of motive. *State v. Hermann,* 283 S.W.2d 617, 621 (Mo.1955). In the case at bar, appellant sought to establish that Jackson, without any inducement from appellant, killed Mrs. Holt because she had refused to extend credit to him after he failed to pay his grocery bill. Appellant also testified that he loved his wife and did not love McAllister. It was necessary for the state to show appellant's motive through his love affair with McAllister and his promise to marry her. The questions asked by the prosecutor sought to establish appellant's serious relationship with McAllister as a motive for wanting his wife killed. The prosecutor did not ask specific questions concerning appellant's sexual relations with McAllister other than whether he had taken her to a motel. The prosecutor's questions were properly focused so as not to be inflammatory. We hold that the evidence of appellant's relationship with McAllister was relevant and material to show appellant's motive.

"Being otherwise competent, relevant and material, the fact that testimony might also tend to discredit defendant's character and that defendant had not put his character in issue would not be a valid ground for excluding the testimony." *State v. Lorts,* 269 S.W.2d 88, 92 (Mo.1954). It is well-settled that evidence which is competent for one purpose cannot be excluded merely because it is incompetent and prejudicial for another purpose. *State v. Gregory,* 339 Mo. 133, 96 S.W.2d 47, 56 (1936); *State v. Calmese,* 541 S.W.2d 349, 351 (Mo.App.1976). The trial court did not err in permitting the prosecutor to question

---

**5.** The trial judge sustained appellant's objections to a question concerning presents appellant allegedly gave Wanda Sue McAllister and a question concerning appellant's desire to have children during his marriage. Appellant also complains that the prosecutor used information from appellant's telephone conversations with McAllister as a basis for his cross-examination; we have already addressed this issue above in Part VI of this opinion.

appellant concerning appellant's relationship with Wanda Sue McAllister, as the prosecutor avoided going into inflammatory matters relating to appellant's specific sexual activity with her.

## X

■ Appellant's final point of error alleges that the trial court committed reversible error when it failed to read the last paragraph to instruction No. 4. Appellant raises this point for the first time on appeal, having failed to object at trial when the instruction was given or when he filed his motion for a new trial.[6] Accordingly, there is nothing pertaining to this instruction for appellate review and we consider the question under the plain error rule, Rule 27.20.[7] *State v. Cook,* 491 S.W.2d 324, 325 (Mo. 1973).

The trial court read instruction No. 4, MAI–CR 2.20, to the jury as follows:

"The fact that the defendant has been charged with an offense is not evidence, and it creates no inference that any offense was committed or that the defendant is guilty.

"The defendant is presumed to be innocent unless and until, during your deliberations upon your verdict, you find him guilty.

"If the evidence in this case leaves in your mind a reasonable doubt as to the defendant's guilt, you must return a verdict of 'Not Guilty'."

The court omitted to read the last paragraph of the instruction which reads:

"This presumption of innocence places upon the state the burden of proving beyond a reasonable doubt that the defendant is guilty."

6. Rule 20.03 provides in part that:
   "[S]pecific objections to given or refused instructions . . . shall be required in motions for new trial unless made on the record at the time of trial."

7. Rule 27.20(c) provides:
   "Plain errors affecting substantial rights may be considered on motion for new trial or on appeal, in the discretion of the court, though not raised in the trial court or preserved for review, or defectively raised or

Appellant claims this omission left the jury without any instruction on the fundamental principle that the state has the burden of proof beyond a reasonable doubt. The record refutes appellant's claim.

■ The court read instructions Nos. 5 through 7 to the jury.[8] Each of these instructions included the following paragraph:

"However, if you do not find and believe from the evidence *beyond a reasonable doubt* each and all of the foregoing, then you must find the defendant not guilty . . ." (emphasis added).

Instructions must be considered together. *State v. Vainikos,* 366 S.W.2d 423, 425 (Mo. banc 1963). Reading instruction No. 4 with instructions Nos. 5 through 7, it is obvious that the jury was instructed as to the burden on the state to prove each element of the offense beyond a reasonable doubt. The jury convicted appellant of second degree murder on the basis of instruction No. 6, which, as noted above, contained a paragraph instructing the jury as to the state's burden of proof. Moreover, appellant's counsel read MAI–CR 2.20 in its entirety to the jury and explained the paragraph, which the trial court had inadvertently omitted, without noting the court's omission.

On the basis of this record, we cannot say that the trial court's omission of the last paragraph of instruction No. 4, MAI–CR 2.20, constituted "manifest injustice" or a "miscarriage of justice" under Rule 27.20(c), and we find no plain error in this regard.

The judgment of the trial court is affirmed.

All concur.

preserved, when the court deems that manifest injustice or miscarriage of justice has resulted therefrom."

8. Instruction No. 5, MAI–CR 6.02, is the approved instruction for first degree murder; No. 6, MAI–CR 6.06, is the approved instruction for second degree murder; and, No. 7, MAI–CR 6.08 is the approved instruction for manslaughter.