STATE of Missouri, Respondent,

v.

Robert B. NEWMAN, Appellant.

No. KCD29402.

Missouri Court of Appeals,
Kansas City District.

June 12, 1978.

Michael L. McDorman, Versailles, for appellant.

John D. Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and SWOFFORD, C. J., and WASSERSTROM, J.

WASSERSTROM, Judge.

Defendant was tried to a jury on a charge of first degree murder. The case was submitted on instructions covering felony murder in the first degree, murder in the second degree, manslaughter and robbery in the first degree by means of a dangerous and deadly weapon. The jury found defendant guilty of murder in the first degree and fixed his sentence at life imprisonment.

The events in question occurred on the late afternoon of April 30, 1976. At about 6:00 p. m. on that day, Lela Nolting, an employee of Nolting's Department Store, was found dead inside the store by the cash register. Her face and head were slashed with wounds such as would have been caused by a knife. The cause of death was a bullet wound to the head.

Defendant and his nephew, Steven Carver, had been seen entering the store shortly before the normal closing time of 5:30. Carver was charged with the crime along with defendant, and Carver pleaded guilty to armed robbery and was sentenced prior to the commencement of defendant's trial. At this trial, Carver appeared as a witness for the prosecution and testified that he and defendant had planned to steal money out of the cash register by means of Carver distracting the clerk while defendant actually took the money. Carver did initiate this plan by going down into the basement portion of the store to look at merchandise, accompanied by Lela Nolting. However, the initial plan of theft for some reason miscarried. Carver and Nolting returned to the main floor of the store, at which point he testified that he went over to look at some belts. According to his testimony, the next thing he knew was hearing a shot, at which he turned and saw Nolting slumping against a counter. He then started moving in Nolting's direction and heard another shot from behind him, after which Nolting completely collapsed. Carver disclaimed any knowledge of any slashing or knife cutting to Nolting. Immediately following the actions described, Carver and defendant proceeded to take money from the cash register, together with some merchandise and made their escape from the store. Carver testified that he had sold defendant a sawed off automatic rifle earlier in the day, which defendant carried with him concealed on his person when the two men entered Nolting's.

On this appeal, defendant assigns five points of which one by itself suffices for

reversal and remand. Of the other matters assigned as error, two are likely to recur on retrial and hence will be briefly discussed.

## I.

 The crucial issue on which this appeal turns is the scope of the prosecutor's cross-examination of defendant. Defendant took the stand on his own behalf, and on direct examination defense counsel followed the standard tactic of asking defendant about his prior convictions, thereby seeking to minimize as much as possible the adverse impact of that disclosure. In response to these questions on direct, defendant admitted that he had been convicted of passing bad checks in Benton County, Missouri, and of battery in Illinois.

Not content with leaving the matter there, the prosecutor sought to emphasize and amplify the prior convictions on cross-examination. That extensive effort was as follows:

"Q. Robert ah . . . you say you've been convicted of several crimes in Benton County for bad checks. Ah . . . do you remember what your sentence . . . what sentence you received for passing bad checks in Benton County?

A. Two years.

Q. And did you go the Department of Corrections, State of Missouri, Jefferson City to serve that two years?

A. Yes.

Q. Did you serve the whole two years?

A. Well, I served 10 months and got out on parole and then fell off parole.

Q. And you fell on parole. What happened when you violated your parole conditions?

MCDORMAN: Objection, Your Honor. It's beyond the scope of direct.

COURT: Overruled.

Q. (By Johnson) You may answer the question. What happened when you fell from parole after serving 10 months in Department of Corrections?

MCDORMAN: Your Honor, may we approach the bench?

COURT: Yes.

(BENCH CONFERENCE OUT OF HEARING OF JURY)

MCDORMAN: Unless this would lead to a conviction, we would have the State . . . I believe it's beyond the scope.

COURT: Well, it's my understanding that he's interrogating about the conviction that your man talked about.

MCDORMAN: The conviction yes, but I don't think he's been . . . stated any since. I think he's going into circumstances now beyond that. He's got the way the statis [sic] of parole, I think anything beyond that is the scope of direct.

JOHNSON: If he fell from parole, then he goes back to prison.

COURT: Well, I would ask . . . permit you to ask if he was reincarcerated in terms of that conviction.

(END OF CONFERENCE)

Q. (By Johnson) Robert, you say you were released after 10 months?

A. Yes. On parole.

Q. Okay. Where did you go after you were released?

A. To St. Louis.

Q. Ah . . . did you do . . . were you reincarcerated after that or reimprisoned?

A. Well, no, not really.

Q. Well, what happened? You say you went to St. Louis?

A. Yes.

Q. And you testified you fell from parole. What happened? What do you mean by the term, fell from parole?

A. I couldn't live on parole standards and thusly . . .

Q. Well, what happened to you, because you couldn't live on parole standards?

A. Well, . . .

What'd you do, what . . . you say you fell from parole and you live on parole standards?

A. Well, I just got drunk and got high on dope and just got where I couldn't live on parole standards.

Q. All right, and then what happened to you? Did somebody do something to you because you couldn't live on parole standards?

A. Yes, they ah . . . sent me to Fulton for examination.

Q. And while you were at Fulton for examination what did they find?

A. Well, they . . . I don't know the exact medical term for it, but ah . . they said there wasn't anything they could do at that time to help me.

\* \* \* \* \* \*

Q. (By Johnson) All right. Ah . . . what year were you in . . . ah . . . incarcerated in the Department of Corrections?

A. 1959. September, 1959.

Q. 1959?

A. 59. 69, I'm sorry about that.

Q. 1970. Were you imprisoned in 1970?

A. I think I was.

Q. All right, and you said you were incarcerated for 10 months and were released, you got into drinking and taking dope and everything and went to Fulton, State hospital No. 1 at Fulton. Ah . . . how long were you in Fulton?

A. 30 days, I think.

\* \* \* \* \* \*

Q. (By Johnson) All right, after you spent 30 days in Fulton, what did you do after you left there?

MCDORMAN: Objection. Beyond the scope of direct.

COURT: Sustained.

JOHNSON: May I approach the bench?

COURT: Yes.

(BENCH CONFERENCE OUT OF HEARING OF JURY)

JOHNSON: Your Honor, he testified that he had been convicted.

MCDORMAN: Your Honor, you said he can ask if he was incarcerated. Again, he's getting beyond it. We're not talking about convictions now.

JOHNSON: Well, we're leading up to.

COURT: You started talking about the Illinois conviction and reprimanded to interrogate on that and is that where . . .

JOHNSON: I'm heading.

COURT: Well, let's ask him specifically about that. You started once and stopped.

(END OF BENCH CONFERENCE)

Q. You testified that you were incarcerated someplace in Illinois?

A. Yes.

Q. When was that?

A. I was arrested 3/23/59. I mean, not 59, but 73, sorry about that.

Q. In 1973?

A. Yes.

Q. Now, what were you arrested for?

A. Ah . . .

Q. In 1973 in Illinois?

A. Getting in a fight in a bar room brawl. Ah . . .

Q. And where in Illinois did this occur?

A. In . . . actually it occurred in Louisiana, Missouri, but I ended up in Pittsville, Illinois, which is a short distance.

Q. And the crime occurred in one state and you were tried and convicted in another state, is that what your [sic] telling this jury?

A. Yes, that's what I'm telling the jury.

Q. And what were the . . . did you stand trial?

A. Yes.

Q. Ah . . .

A. Well, actually didn't stand trial, I copped a plea.

Q. You copped a plea?

A. For a negotiated plea. And . . .

Q. You've [sic] kind of worldly wise about copping pleas and getting reports from police officer.

A. Well, I . . .

MCDORMAN: Objection. That's beyond the scope of direct.

A. May I answer?

COURT: Overruled. He may answer.

Q. You may answer.

A. I don't see as where it makes any difference Mr. Prosecutor because until just . . . until now, I've never really got any scope of justice out of the society the way it is now. And I'm depending on these twelve jurors with the alternate there to bring in a verdict and at least give me some justice in this world.

Q. Well, you didn't think you deserved to go to the penitentiary. And . . . and bad check writing for two years, that wasn't justice to you?

A. Well, that is not in evidence. I, of course copped a plea then too. But ah . . . there was certain mitigating circumstances about it too.

Q. Well, like you might of been guilty of writing a bad check and cheating somebody out of some money. Is that possible?

A. Well . . .

Q. You did get some money for that bad check, didn't you?

A. No.

Q. You didn't? What did you get for it?

A. Nothing. The sheriff of Pettis County got that check.

Q. Well, the sheriff of Pettis County got that check?

A. Right.

Q. Well, who did you write . . . who did you give the check to?

A. I never wrote the check.

Q. You never wrote the check?

A. I never wrote the check.

Q. Did somebody else write it for you?

A. Somebody else wrote it.

A. And it was a forgery of your signature?

A. No, it wasn't. Well, actually yes, but I was there. I knew it was going on. All I was supposed to do was cash the check, which is . . . this isn't proper cross-examination, Your Honor.

Q. You did cash the check?

A. No, the check wasn't cashed.

Q. You didn't receive anything for it.

A. No.

Q. Except two year imprisonment?

A. Except two years.

* * * * * *

Q. (By Johnson) What sentence did you receive in Illinois?

A. 1 to 6.

Q. 1 to 6 years?

A. Yes.

Q. Ah . . . did you stand trial?

A. No.

Q. Did you plead guilty to the charge of . . . brought against you by the state?

A. Mitigating with . . . I ah . .

Q. Answer the question.

A. Yes, no.

Q. Did you plead guilty to the charge that the state of Illinois brought against you that resulted in the sentence of 1 to 6?

A. A negotiated plea, yes.

Q. And what was the charge that was brought against you by the state of Illinois that you negotiated a plea for and got 1 to 6?

A. Aggravated battery.

Q. Was there a weapon used?

A. Ah . . . well, yes, that's how come I was in the fight in the first place.

Q. Well you were . . .

A. That's what aggravated battery is. It's for the benefit of the jury. Ah . . . a man pulled a knife on me and I . . . being like it was, I just him him with my fist. There was no . . . he was the only one that had a weapon.

 \* \* \* \* \* \*

Q. (By Johnson) After you were sentenced, did you go to prison in the state of Illinois?

A. Yes.

Q. Ah . . . how long did you stay in prison?

A. Three years.

Q. Ah . . .

A. Actually not a full 36 months, but about ah . . . 30 or 34 or 35.

Q. 33. When were you released from prison?

A. February of this year."

When a defendant in a criminal case takes the stand to testify, he opens the door to a showing by the prosecution of his prior convictions as affecting his credibility. This result follows from Section 491.050 and Section 546.260. (All statutory references herein are to RSMo 1969.) The first of those sections provides that a person who has been convicted of a crime is competent to testify, but that his conviction is admissible in evidence "either by the record or by his own cross-examination, upon which he must answer any question relevant to that inquiry." The section second above cited provides that one criminally accused may testify at his trial and is then subject to cross-examination "as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness in the case." These statutory sections have been interpreted to give the

prosecution an absolute right to show the prior convictions once the accused elects to testify. On the other hand, that opportunity is not unlimited. The prosecution is entitled to show only "the nature and number" of prior convictions, and is not entitled to engage in cross-examination of the defendant with respect to details of the prior crimes. *State v. Scott,* 459 S.W.2d 321 (Mo. 1970). In particular, as it affects this case, the prosecutor may not cross-examine with respect to the length of time the defendant was imprisoned, after that period of imprisonment has been fully served and concluded. *State v. Slay,* 406 S.W.2d 575, l. c. 580[7] (Mo.1966); *State v. Hoelzer,* 493 S.W.2d 703, 1. c. 706[7] (Mo.App.1973). See also *State v. Porter,* 538 S.W.2d 888 (Mo.App. 1976).

Under the ruling in *Slay,* the whole line of cross-examination in question was improper. Defendant's Missouri sentence had been fully served by 1972, and he had been released from prison in Illinois in February, 1976. The completion of both those prison terms accounts for his being at large on April 30, 1976, at the time the events occurred for which defendant was on trial in October, 1976.

The error in permitting the relatively simple questions as to how much time he had served in prison was compounded by the further questions put to him to elicit the facts pertaining to his breach of parole and his use of drugs as well as excessive consumption of alcohol during his period of parole. This latter cross-examination could not help but be devastating in the eyes of the jury. It further aggravated the poisonous effect of the improper elaboration upon the prior convictions, the general prejudicial effect of which was pointed out in *State v. Mobley,* 369 S.W.2d 576 (Mo.1963), and quoted with approval in *State v. Scott, supra:*

"All lawyers and judges know that a jury's knowledge of prior convictions is, in itself, a most damning thing in the trial of a criminal case. When used for legitimate purposes, the defendant must take his chances on this. But prosecutors

should not seize upon such an opportunity to further prejudice the defendant by undue repetition and insinuations, or to convey the idea of guilt by reason of the prior offenses."

The State seeks to avoid the impact of this point by two arguments. It says, first, that defendant did not adequately object to all of the questions when asked. It has been held, however, there need not be an objection to each question put to a defendant on cross-examination which is beyond the scope of the direct examination in order to save the point for appellate review. *State v. McKissic,* 358 S.W.2d 1, 6 (Mo. 1962). Wholly aside from that, defense counsel in this case made clearly and repeated objections to the improper cross-examination, as amply appears from the portions of the record already quoted.

The second argument made by the State in connection with this point is that defendant was not prejudiced by the cross-examination in question. The State argues that defendant's "sole defense" was that he was not guilty by reason of mental disease or defect and that the matters brought out by the prosecution dealing with defendant's inability to fulfill his parole requirements and his referral to the state hospital because of alcohol and drug abuse "are all to some degree beneficial to appellant's theory of 'mental disease or defect'." It is true that defendant filed a plea of not guilty by reason of mental disease or defect excluding responsibility. However, the State's argument conveniently ignores defendant's right, despite that plea, to have the State prove the offense charged against him. Section 552.030–2 specifically provides that a plea of not guilty by reason of mental disease "shall not deprive the defendant of other defenses." It would be excessively naive to believe that the prosecution engaged in the cross-examination in question in order to assist defendant to prove his objection to a mental defect; quite obviously, that cross-examination was undertaken in order to help persuade the jury as to the elements of the crime on which the State had the burden of proof. The State cannot be heard to say that this testimony, which it fought so hard to get in, was beneficial rather than harmful to defendant.

## II.

When Carver appeared to testify as a prosecution witness, he was accompanied by his lawyer, Mr. Kenneth Romines. The court permitted Romines to sit at the prosecution counsel table and further permitted him to participate in the trial during the time that Carver was on the stand to the extent of making objections to a number of the questions submitted to the witness Carver. Defendant assigns as error the permission so granted by the trial court to Romines.

Defendant pitches his objection on the theory that Romines was a "private prosecutor" and that the practice of permitting private prosecutors was proscribed in *State v. Harrington,* 534 S.W.2d 44 (Mo. banc 1976). This theory of objection cannot be sustained for the reason that Romines was not a private prosecutor in the sense outlawed by *Harrington.* Rather Romines was present in the court room solely for the purpose of representing and protecting the rights of witness Carver.

Every witness should be accorded the right of counsel so that he may take advantage of the protections afforded him by the law, such as the privilege against self-incrimination and the privilege of confidential communication between attorney and client. See *State v. Barker,* 43 Wash. 69, 86 P. 387[2] (1906); *Smith v. State,* 78 Tex. Crim. 537, 182 S.W. 311[1] (1916). Nevertheless, that does not serve to make the witness a party to the prosecution and does not give him or his attorney any right to participate generally in the trial proceedings as one of the litigants. Carver had a right to have his attorney Romines present in the courtroom in order to object for the purpose of advising Carver of his right to refuse to testify to some particular question which would violate his legal rights mentioned; but Romines had no right to participate otherwise in the process of examination, and in this case the objections made by

Romines did not relate to any privilege which would give Carver a right to decline to testify. The court therefore erred in permitting Romines to make routine objections outside the area of privilege to questions being asked of the witness. This should not be permitted to recur on retrial.

### III.

■ The prosecution submitted a verdict directing instruction of first degree murder on the theory that Lela Nolting had been killed in the course of commission of a robbery, as proscribed by Section 559.010. Defendant requested an additional instruction under which the jury could find common law felony murder in the second degree on the theory that the death had occurred in the course of the commission of a theft as proscribed by Section 559.020. Defendant assigns as error on this appeal the refusal of the court to give that requested instruction.

Defendant urges that the evidence shows that defendant and Carver intended only to steal money from the cash register without any violence. In support of this thesis, defendant points to Carver's testimony that he and defendant had agreed in advance on a plan for Carver to distract Nolting so as to permit defendant to steal money from the cash register unnoticed.

The trouble with this argument is that whatever may have been the original plan, that went awry. In actuality, violence was used, both by knife and by gun, before the taking. As between robbery and theft, the evidence showed only robbery. Therefore the court committed no error in declining to give the requested instruction. See *State v. Pride,* St. Louis District, Mo.App., 567 S.W.2d 426, 1978, and cases therein cited.

Because of the error in permitting an excessive scope of cross-examination with respect to prior convictions, the judgment of conviction is reversed and this case is remanded for new trial.

All concur.