STATE of Missouri,
Plaintiff-Respondent,

v.

Emmett Eugene EBY,
Defendant-Appellant.

No. 11878.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 24, 1981.

Motion for Rehearing or Transfer Denied
Dec. 10, 1981.

Application to Transfer Denied
Jan. 18, 1982.

Stephen R. Soutee, Marionville, for defendant-appellant.

John Ashcroft, Atty. Gen., Nancy J. Appelquist, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

Defendant was charged with stealing cattle, as denounced by § 570.030, RSMo 1978.[1] A jury found defendant guilty and assessed

---

1. References to statutes and rules are to RSMo 1978, V.A.M.R. and Missouri Rules of Court (11th ed. 1980).

his punishment at imprisonment for a term of 4 years. Defendant appeals.

Defendant has briefed two points. The first of these is that there was no substantial evidence to support the judgment of conviction. As against this argument, the State is entitled to the most favorable construction of all the evidence and the reasonable inferences to be drawn therefrom, and this principle applies even though the proof of guilt is circumstantial. *State v. Lee*, 556 S.W.2d 25, 32[13] (Mo. banc 1977); *State v. Cobb*, 444 S.W.2d 408, 412[3] (Mo. banc 1969); *State v. Sykes*, 372 S.W.2d 24, 26[3] (Mo.1963).

So taken and considered, the record shows: In May 1979, Gary Burton and his brother were pasturing cattle on a 156-acre farm near Marionville in Stone County. The land had belonged to the Burton family, but had been sold to one Rex Springer. The Burtons leased the land from Springer, who lived nearby and "watch[ed] the land" for Burton and his brother.

On May 10, Burton had 26 head of Holstein steers on the Stone County land. The cattle were marked with numbered yellow ear tags which had Burton's initials "on the back." Burton counted his cattle on Saturday, May 19, and discovered eight head were missing. He contacted the Sheriff of Stone County, and thereafter checked the fences and gates. The fences were up and one of the two gates was locked. The gate near the Springer house was open, but Burton concluded his cattle had been taken. Upon trial, Burton was asked, "Did you give permission for anybody to take those cattle from your pasture in Stone County?" His answer was "No."

Burton then "went and got" Mr. Springer's son, who is the defendant's nephew. The nephew showed Burton "this place." "This place" is a 40-acre tract of land in Barry County about 2 miles north of the intersection of Barry County Road "C" and State Highway 248. At the time, the defendant owned this land but did not live on the premises. Burton found six of his eight steers on the defendant's farm in a "holding pen." This "holding pen" was described as "about an acre" of land with a "[w]oven wire and barbed wire" fence around it. When Burton arrived there on Saturday afternoon, the six steers he found were still carrying his yellow ear tags. There was a pond in the holding pen and hay had been thrown on the ground.

Burton spoke with the city marshal of Crane, Missouri, as he went to try to locate his cattle. The marshal recalled that Burton "told [him] he was going to look at a place and ... thought he knew where his cattle was [sic] and if he found them, then he would call me." About 7:45 p. m. on Saturday, May 19, Burton called and "said he had found his cattle."

Burton and young Springer remained near the defendant's farm. The marshal summoned other peace officers and about an hour later, the Sheriffs of Stone and Barry Counties and several of their deputies arrived at the Barry County location. Thereupon, according to Burton, "We all went down and looked at the cattle and looked at the identification on them." The peace officers decided to "put a stake-out" on the cattle "to see who was taking care of them."

A number of officers participated in the surveillance of defendant's farm. Mr. Hembree, the city marshal of Crane, was a deputy sheriff of Stone County. He and George Scobee, another Stone County deputy, were "staked out" from about 8 p. m. on Sunday until Monday morning. These officers were located near the defendant's farm on County Road "C." Mr. Hembree's recollection of the incident was not very clear, but he remembered that Burton's cattle were out of the holding pen on the road near an adjoining house on Monday morning; defendant appeared and drove the cattle back to his farm. Mr. Scobee, who was called by the defendant, was not much more definite.

Mr. Bunnell, a Barry County deputy, recalled being present on the defendant's farm on Saturday, May 19. He was there "[p]robably an hour" at that time. This witness recalled having seen the cattle "in the [holding] pen," but said "at sometime"

either on Saturday or on Sunday afternoon, there was one "stray" out of the pen. This witness participated in the surveillance of defendant's property; he saw defendant on the premises on Sunday, but did not see him do anything with the cattle.

Mrs. Ruth Pryor lived near the Barry County tract where the cattle were found. Mrs. Pryor testified that about the time in question, some cattle had strayed onto her property and along the road by her property; she had seen the officers on stake-out, and had been informed they were trying to determine who owned the cattle. Mrs. Pryor had not seen the defendant for several days, but it was not unusual for defendant's cattle to stray from his premises into the road or onto her farm. On Monday morning, Mrs. Pryor called the defendant— she thought he lived at Galena—and asked him if he had any cattle on the Barry County tract. The defendant said he did, and "he would be on over."

Vernon Still, Sheriff of Barry County, testified that he was "on" the defendant's property on Saturday, May 19. The steers were in the holding pen at that time. He had seen the cattle in defendant's pen again on Sunday. Sheriff Still did not participate in the surveillance on Sunday but he was notified when the defendant appeared early on Monday, and he thereupon "arrested" the defendant. Sheriff Still "asked [defendant] where he got the cattle." The defendant "said there was nine and, 'I bought them from a person at Hurley, and if they were stolen, I won't tell you.'"

Defendant testified that he "lived with his mother." In 1961 or 1962, he had been convicted of burglary. He was "born and raised" in Stone County but in 1963, he moved to a "suburb of Detroit." Defendant had prospered in Michigan. After he "split up" with his wife, he sold his property and returned to Missouri.

Over the weekend in question the defendant accompanied "four attorneys from Kansas City" on a fishing trip. He and his brother acted as guides on Saturday, but on Sunday it "poured rain" and the defendant finally went to his farm on Sunday evening.

Defendant had nine head of cattle at the time; his "perimeter" fence was "not too hot" and it was not unusual for his cattle to "get out" and go over onto Mrs. Pryor's property.

Defendant testified he had not been on his farm for "[a]t least a couple of weeks" before he went there on Sunday, May 20. When he went by on Sunday, defendant "seen six" Holstein cattle in the "holding pen." Defendant also found that some person had put "four, five or six hundred" bales of hay in his barn. He responded to Mrs. Pryor's call to protect the cattle and to protect travelers on the road, but became aware that the Holstein cattle were not his only after he began rounding them up. Defendant was asked if he made a statement to Sheriff Still; his response was "I never made a statement to nobody."

From this evidence rational triers of fact could find beyond a reasonable doubt that: 1) at some time between May 10 and May 19, 1979, eight head of Burton's cattle were taken; 2) during the evening of May 19, six head of those cattle were found securely fenced in a 1-acre enclosure located on land which defendant owned but did not occupy; 3) that the defendant knew Burton's cattle were enclosed in his pen on Sunday, May 20; 4) that the cattle thereafter got out of defendant's pen and onto a public road and a neighbor's property; 5) that, being informed the cattle were "out," defendant rounded them up and enclosed them in his pen, and 6) when defendant was asked about his acquisition of the stolen cattle, he asserted he had bought them, and if they were stolen he would not admit it.

As noted, defendant's principal argument is that the evidence is not sufficient to warrant a judgment of conviction. As expanded in the "Argument" part of his brief, his contention is that the State adduced no proof that he was on or near the Burton pasture between May 10 and May 19, or that he had the means to transport Burton's cattle from the Stone County pasture to the Barry County farm where they were found. This argument is based on the assumption that caption and asportation are essential

elements of stealing property without consent, as they were under former § 560.156.-1(2). See *State v. Eye*, 415 S.W.2d 729, 730–731[2, 3] (Mo.1967). The first question, therefore, is whether the proof establishes an "appropriation" within the meaning of § 570.010(3). We undertake a construction of the word "appropriate" in the belief that this court, particularly the writer, has failed to grasp the General Assembly's intention in enacting § 570.030. Our construction is based on an admittedly limited, but reasonable research.

At the common law and under former § 560.156 the basic theory of a larceny was a trespassory taking from the possession of the owner. *State v. Ballard*, 394 S.W.2d 336, 342[10] (Mo.1965); see generally, 3 W. Holdsworth, A History of English Law, 360–366 (5th ed. 1942). A very slight asportation was sufficient at the common law, 1 W. LaFave and A. Scott, Criminal Law § 86, pp. 631–632 (1972), and perhaps was not necessary under former § 560.156. *State v. Ballard, supra*, 394 S.W.2d at 342. Nevertheless, our courts at times construed former § 560.156 to require a "felonious taking and carrying away." *State v. Eye, supra*, 415 S.W.2d at 730–731; *State v. Miles*, 412 S.W.2d 473, 475[1–8] (Mo.1967). Some degree of disparity among the precedents construing a statute is certainly not unusual, but § 570.030 is a new statute, and our question is whether caption and asportation are necessary elements of the offense of stealing property without consent under that statute.

To a considerable extent, our Criminal Code is based on notions derived from the Model Penal Code. Article 223 of the Model Code represents an attempt to replace traditional acquisitive offenses—larceny, embezzlement, false pretense, extortion, fraudulent conveyance and receiving stolen property—with a single offense called "theft." Section 223.0 is a "definition" section comparable to § 570.010; §§ 223.2–223.9 define the various forms of "theft" intended to replace specific common-law and statutory acquisitive offenses. See Model Penal Code and Revised Commentaries, part II, vol. 2, p. 122 (1980) [hereinafter Revised Commentary].

The framers of the Model Code replaced larceny with an offense called "Theft by Taking or Disposition." Behavior constituting "theft" of the larceny-embezzlement type is denounced by § 223.2(1), which provides "A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another . . . ." Section 570.030 is obviously more inclusive than subsection (1) of § 223.2, but the commentary upon § 223.1(1) of the Model Code states clearly that the Institute intended to eliminate caption and asportation as elements of that criminal act which formerly constituted larceny. Revised Commentary, *supra*, at 163–165. The revised commentary includes a helpful collection of statutes which adopt the approach reflected in § 223.2(1) of the Model Code. Revised Commentary, *supra*, at 165, n. 3.

We have examined a number of the statutes cited, focusing our attention upon the Illinois statute, S.H.A., ch. 38, § 16–1(a), the Minnesota statute, M.S.A. 609.52 subdiv. 2(1), and the Wisconsin statute, W.S.A. 943.20(1)(a). The Minnesota statute uses language similar to § 570.010(3) to define the acts which constitute "theft," but M.S.A. 609.52 subdiv. 2(1) is part of a statute so complex it cannot fairly be compared to § 570.030. The Illinois statute, S.H.A., ch. 38, § 16–1(a) provides that "A person commits theft when he knowingly [o]btains or exerts unauthorized control over property of the owner." This definition is somewhat similar to § 570.010(3), and caption and asportation are not necessary elements of the crime of theft in Illinois. *People v. Parker*, 77 Ill.App.3d 536, 33 Ill.Dec. 21, 396 N.E.2d 97, 100[4] (1979).

The Wisconsin statute cited in the Commentary is couched in terms very similar to § 570.010(3). Section 570.010(3) provides: " 'Appropriate' means to take, obtain, use, transfer, conceal or retain possession of." In 1953, Wisconsin adopted a statute defining theft in the following language, W.S.A. 943.20(1)(a):

"943.20 Theft. (1) *Acts.* Whoever does any of the following may be penalized [for theft]:

(a) With intent to appropriate the property to his own use, intentionally *takes, uses, transfers, conceals or retains possession of* the property of another without his consent ...." (Emphasis added.)

In *State v. Genova*, 77 Wis.2d 141, 252 N.W.2d 380 (1977), the court addressed itself to a legislative oversight found in the 1955 reenactment of the quoted statute, but its comment upon the 1953 version, 252 N.W.2d at 384, is illuminating:

"It should be noted that 'takes' is in the disjunctive series including 'transfers.' *An individual who does any one of those acts*—takes, uses, transfers, conceals or retains possession—would violate the statute." (Our emphasis.)

The Missouri Committee to Draft a Model Criminal Code included a good deal of instructive commentary when it prepared the Proposed Criminal Code, first published in 1973. Although that commentary was not in terms included in the act now called "The Criminal Code," Laws of Mo.1977, p. 658, the court is entitled to assume the General Assembly was aware of and intended to adopt that interpretative comment when it enacted the Code provisions. *State v. Anderson*, 515 S.W.2d 534, 539[4, 5] (Mo. banc 1974); *Dupont v. Chagnon*, 119 N.H. 792, 408 A.2d 408, 409–410 (1979). See J. Sutherland, Statutes and Statutory Construction, ch. 52 (C. Sands 1973).

The committee comment to Code Section 15.030(1), now codified as § 570.030.1, is enlightening. The commentary refers to "problems" encountered in determining whether "stealing" under former § 560.156 included the elements of common-law "theft offenses" and adds, 41 V.A.M.S. at 446–447:

"Because of these problems, the Code provides for a new stealing statute, which more clearly lists the elements of the offense.

Under the Code, the following are the essential elements:

1. There must be an *appropriation*
2. of *property* or *services*
3. *of another*
4. with the *purpose to deprive* the other thereof
5. accomplished
   a. *without* the owner's *consent*, or
   b. *by means of deceit*, or
   c. *by means of coercion.*

These are the only essential elements under the proposed statute, and are defined by statute...."

■ To return to our question, we reiterate that § 570.010(3) defines "appropriate" to mean "take, obtain, use, transfer, conceal or retain possession of." The commentary on this definition, 41 V.A.M.S. at 434, is that "The definition is *new* but it is based on the definition of exercising dominion in [former] § 560.156 RSMo. No purpose is served by using both 'appropriate' and 'exercise dominion.'" (Our emphasis.)

■ From the interpretative materials available to us, we conclude the General Assembly intended to create an entirely new offense when it enacted § 570.030. We further conclude that because the word "appropriate" as defined in § 570.010 includes "take," the statute includes that criminal act which formerly constituted larceny. However, the word "take" is in a disjunctive series ending with the words "conceal or retain possession of." Exercising control by any of the enumerated acts, with the requisite intent, is an "appropriation." Caption and asportation are not essential elements of stealing property without consent.

■ It must be further borne in mind that there is a rule of evidence, accepted in some form everywhere, that possession of stolen property permits the inference that the possessor is the thief, provided: (a) the possession is unexplained by any innocent origin; (b) the possession is fairly recent, and (c) the possession is exclusive. 9 J. Wigmore, Evidence § 2513, pp. 547–554 (Chadbourn rev. 1981). The older texts add the requirement that there be a distinct and conscious assertion of right to the property by the defendant. 1 C. Torcia, Wharton's Criminal Evidence § 139, pp. 236–238

(1972). As usually stated by our courts, the rule is that a defendant's unexplained and exclusive possession of recently stolen property permits the inference that the defendant is the thief. *State v. Clark*, 438 S.W.2d 277, 279[1, 2] (Mo.1969); *State v. Durham*, 367 S.W.2d 619, 621–622[2, 3] (Mo.1963), cert. denied 375 U.S. 861, 84 S.Ct. 130, 11 L.Ed.2d 89 (1963); *State v. Denison*, 352 Mo. 572, 178 S.W.2d 449 (1944). The principle has been tempered by a requirement that the defendant's possession be a personal possession, exclusive, distinct and conscious, and unexplained. *State v. Durham, supra*, 367 S.W.2d at 621–622. And, at the moment, a showing of unexplained possession of recently stolen property is a constitutionally acceptable substitute for more direct proof of defendant's guilt beyond a reasonable doubt, *Barnes v. United States*, 412 U.S. 837, 845–847, 93 S.Ct. 2357, 2362–2363, 37 L.Ed.2d 380, 387[2–8] (1973), provided the inference of guilt from such a showing is not made mandatory. *See Sandstrom v. Montana*, 442 U.S. 510, 521–523, 99 S.Ct. 2450, 2458–2459[4, 5], 61 L.Ed.2d 39, 49–51 (1979).

■ These principles considered, could rational triers of fact have found beyond a reasonable doubt that defendant "appropriated" Burton's cattle? One means of appropriation is "obtaining." Given its commonly and reasonably understood meaning, the transitive verb "obtain" means "to get hold of by effort; to get possession of; to procure; to acquire in any way." Merriam-Webster New International Dictionary, p. 1682 (2d ed. 1955).

It was shown that Burton discovered his cattle were gone on Saturday, May 19. On the same day, he found six of his missing steers in a holding pen on the defendant's farm. We do not know precisely how far it is from Burton's pasture in Stone County to defendant's farm in Barry County, but it is some distance, and the record makes it clear that defendant's farm is in a remote rural area. When Burton found his cattle on the defendant's farm, they still carried the yellow ear tags with which he had marked them. The defendant testified that he saw

"some Holsteins" in his holding pen on Sunday evening, May 20. His testimony then proceeded: "Q. Did you see any of yours at that time? A. No. Mine was in the pasture, all but one. Q. Did you think it unusual because those cattle were there? A. No, because four, five or six hundred bales of hay was put in my barn. Q. Do you know why the cattle were in the holding pen? A. Not really." Bearing in mind that "unexplained" possession of recently stolen property means unsatisfactorily explained, or explained in a manner a trier of fact would not be obliged to believe, *State v. Clark, supra*, 438 S.W.2d at 279[3], the evidence we have just recited constituted a showing of unexplained and exclusive possession of recently stolen cattle, and that this possession was personal, distinct and conscious. Inasmuch as such a showing would have permitted an inference of caption and asportation, it would a fortiori have permitted an inference beyond a reasonable doubt that defendant "obtained" and therefore "appropriated" Burton's cattle.

There is actually no question of the sufficiency of the evidence to establish elements (2), (3) and (5) of the offense charged. The cattle were "property"; they belonged to Burton and were manifestly the property "of another." Inasmuch as Burton testified directly and unequivocally that he gave no one permission to remove the cattle from his Stone County pasture, the jury could find beyond a reasonable doubt that the appropriation was accomplished "without the owner's consent."

This brings us to the final element of the crime charged, the "purpose to deprive" the owner of his cattle. The term "purpose to deprive" as defined by § 570.010(8) was said by our committee to be "a most important definition ... which replaces the 'intent to steal,'" 41 V.A.M.S., p. 436, but an examination of the interpretative materials available convinces us that § 570.010(8) does not significantly expand common-law notions of the "intent to steal" which was an essential element of larceny. Granted it is no longer essential to find that the de-

fendant intended to withhold the property from the owner permanently, it was clear from the common-law precedents "that convictions were sustained upon evidence that fell considerably short of proving a purpose totally and finally to deprive another of his property." Commentary, *supra*, at 174. See generally R. Perkins, Criminal Law, 266–271 Subsect. F. 2, 3, 4 and 7 (2d ed. 1969). Here, we are concerned only with that order of intent defined by § 570.-010(8)(a), an intent to withhold property from the owner permanently.

Defendant was in knowing and conscious possession of the cattle on Sunday, May 20, but up to the time he rounded the cattle up on Monday, his exercise of dominion over the cattle was entirely consistent with recognition of the rights of the owner. And, his action in herding the cattle back onto his farm would remain equivocal except for the statement he made to Sheriff Still after he was taken in custody. Upon being asked where he got the cattle, the defendant replied there were nine head and "I bought them from a person at Hurley, and if they were stolen, I won't tell you."[2] This assertion of right to the stolen property may not be as direct and positive as a sale or an attempted sale would have been, see *State v. Watson*, 92 S.W.2d 103, 105[2] (Mo.1936); nonetheless it was a distinct and conscious assertion of right to the cattle from which a jury could infer an intent to deprive the owner of his property permanently. If our limited construction of the statute is correct, the State produced evidence from which any rational trier of fact could find every element of the crime charged beyond a reasonable doubt.

█ The other point briefed and argued is that the State improperly questioned the defendant about the sentences he served in connection with prior convictions. Defendant argues that this improper cross-examination was calculated to inflame the minds of the jury and the trial court's error in

permitting that cross-examination requires a new trial. We are cited to *State v. Newman*, 568 S.W.2d 276 (Mo.App.1978), a precedent with which we have no disagreement.

When defendant took the witness stand in his own behalf, his counsel asked defendant if he had ever been convicted of a crime; defendant answered "Yes," and the direct examination proceeded thus: "Q. What was that [crime]? A. Burglary Q. What year was that? A. '61 or '62. Late '61. Q. What was your age at that time? A. 25. Q. Have you ever been convicted of any other crime? A. Nothing only misdemeanors or something like that."

The cross-examination to which defendant now objects and argues was incurably prejudicial ran as follows: "Q. Mr. Eby, have you ever been convicted of a felony stealing charge? A. Yes. Q. A felon[y] burglary and larceny charge? A. Yes, it's the same thing. Q. Would it surprise you to learn they are not the same thing? A. Well, I don't know. Q. You did plead guilty to burglary on May 26, 1976 or 1962, rather and pleaded guilty to larceny? A. Yes. Q. And for those offenses you were sentenced to—[COUNSEL FOR DEFENDANT]: Your Honor, I am going to object to going into this. [THE] COURT: The objection will be sustained. [THE PROSECUTING ATTORNEY]: Q. And you have been convicted of [sic] stealing another time? A. Once but that was—Q. Were you sentenced in Michigan on a—[COUNSEL FOR DEFENDANT]: This is improper. [THE] COURT: I don't believe it is relevant." The State pursued the matter no further.

Comparison of this record with the long excerpt of the record set out in *State v. Newman*, *supra*, 568 S.W.2d at 278–280, shows at once that defendant's citation of *Newman* is inapt. The State's cross-examination does not emphasize and amplify the prior convictions to the degree found in *Newman*; in *State v. Scott*, 459 S.W.2d 321,

---

**2.** We note that defendant did not object to this evidence on the basis of any exclusionary rule; any error in admitting Sheriff Still's answer must be considered waived. See *State v.*

*Crawley*, 501 S.W.2d 31, 33[5] (Mo.1973); *State v. Meiers*, 412 S.W.2d 478, 481[2–5] (Mo. 1967).

323 (Mo.1970), our Supreme Court held that the State may properly inquire into the nature and number of prior convictions and the State went no further here. The trial court granted all the relief requested by the defendant. MAI–CR 2d 3.58 was read to the jury as Instruction No. IX.[3] Defendant was not prejudiced by the State's cross-examination, and the point is without merit.

There is no error in any respect briefed in this court; the "plain error" rule has not been invoked, and we discern no reason to apply it. The judgment of conviction is affirmed.

PREWITT, P. J., and BILLINGS, J., concur.

---

**3.** As given, Instruction No. IX read: "If you find and believe from the evidence that defendant was convicted of the offense of Burglary and Larceny in Stone County, Missouri, in 1962, and convicted of Larceny in Wayne County, Michigan, in 1961, you may consider that evidence for the sole purpose of deciding the believability of the defendant and the weight to be given his testimony and for no other purpose. You must not consider such previous conviction as any evidence that the defendant is guilty of any offense for which he is now on trial."