STATE of Missouri, Respondent,

v.

Floyd A. CATES, Appellant.

Floyd A. CATES, Appellant,

v.

STATE of Missouri, Respondent.

Nos. WD 44598, WD 46243.

Missouri Court of Appeals,
Western District.

May 11, 1993.

Rebecca L. Kurz, Appellate Public Defender, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before FENNER, P.J., and ULRICH and SPINDEN, JJ.

PER CURIAM.

Floyd Cates appeals from a conviction of second degree robbery pursuant to section 569.030, RSMo 1986.[1] Cates had been charged by a grand jury on October 24, 1990, and a substitute information charged Cates as a prior and persistent offender. A jury found Cates guilty of second degree robbery on January 15, 1991. The court sentenced Cates as a persistent offender to twenty years imprisonment.

Cates filed a motion for post-conviction relief, which was denied after a hearing on March 24, 1992. The direct appeal has

---

1. All statutory references are to RSMo 1986    unless otherwise noted.

been consolidated with his appeal from the denial of a Rule 29.15 motion for post-conviction relief. Rule 29.15(1). However, Cates has failed to raise any issues regarding his post-conviction proceedings. Therefore, the appeal from the denial of post-conviction relief is dismissed. *State v. Gillispie*, 790 S.W.2d 519, 520 (Mo.App.1990).

The evidence, viewed in the light most favorable to the jury's verdict and disregarding evidence to the contrary, reveals the following events. *State v. Applewhite*, 771 S.W.2d 865, 866 (Mo.App.1989). Lisa Bratton was a loss prevention officer for the K–Mart on Englewood and Vivion Roads in Clay County, Missouri. In October, 1990, Ms. Bratton noticed a man in a red jacket walking about the store in what she felt was a suspicious manner. Two or three days later, on October 17, 1990, Ms. Bratton was using the telephone at the service desk near the front of the store when she saw the same man in the same jacket, whom she identified as Cates, walk into the store.

Because she was suspicious, Ms. Bratton followed Cates through the store. Cates worked his way back to the shoe department, where Ms. Bratton saw him tuck a pair of little girl's black shoes inside his jacket. Cates then went over to the sporting goods department, and Ms. Bratton observed him putting a spool of fishing line in his shirt. Ms. Bratton then followed Cates to the front, past the service desk, where he exited the store without paying for the shoes or fishing line.

The exit at K–Mart was described as a vestibule; there was a set of glass doors separating the store and small, glass enclosed area where a second set of glass doors led outside. Ms. Bratton described what happened as Cates left the store:

> Once we exited the store, at the sidewalk right outside the door, I stopped Mr. Cates and I.D.'d myself as K–Mart security and asked him to come back in the store with me, and kind of led him back in between the vestibule. The door was still partially open, and we just stepped back in. He told me he didn't know what I was talking about, and he turned and started to leave. And I kind of pulled him over and I tapped the shoes in his jacket and said I need to talk to you about these shoes. Well, he kind of pushed my hand off and told me that he didn't know what I was talking about and turned once again to leave. We struggled a little bit. He told me that I didn't have to hold on to him. I asked him if he had I.D. He said that he did have I.D., and that he would cooperate with me. So we turned and started to head in the store, which is the second set of glass doors. And as I opened the door, he turned around and shoved me. I grabbed his jacket from behind, and when he shoved me I fell down to my knees, and I grabbed his jacket, he came around with his hand and hit me on the arm to knock my hands off his jacket. I was able to grab his jacket as he was going out the door and it drug me a little bit because I was still on one leg and foot. And at that point I wasn't able to hold on any longer. And he proceeded to run up the sidewalk towards the patio.

Ms. Bratton ran after Cates, and called to Michael Graham, an employee in the patio department, to help her. Mr. Graham jumped in his truck and headed Cates off as he was running into a church lot behind K–Mart. Clint Moore, a K–Mart customer, was in the parking lot and saw Ms. Bratton chasing Cates, and began to run after him. Mr. Moore saw Cates throw the shoes under a dumpster as he fled.

Mr. Graham managed to cut Cates off and got out of his truck and jumped Cates in the church parking lot. Mr. Moore was close behind, and Mr. Graham wrestled Cates under control, sitting on his back until Ms. Bratton arrived with the handcuffs. The fishing line was recovered from inside Cates's shirt, and the shoes were recovered from underneath the dumpster. When the police arrived, Cates admitted taking the line and the shoes, but denied that he struck or pushed Ms. Bratton.

The judgment is affirmed.

■ For his first point, Cates claims there was insufficient evidence to support the verdict in that there was no evidence

that he used physical force in preventing *resistance to the taking,* as opposed to resistance to the retention, of the property. Although Cates's motions at trial challenged the sufficiency of the evidence, this appeal is the first time that this particular theory has been advanced. The motions are completely silent on why the evidence was insufficient, and during argument on those motions, counsel merely questioned whether Cates's actions in escaping from Ms. Bratton's grasp were sufficient to constitute the physical force necessary to convict Cates of second degree robbery. Nonetheless, we shall review the matter for plain error, because the argument that the evidence was insufficient to support the verdict impacts directly upon Cates's substantial rights. *State v. Newland,* 592 S.W.2d 495, 497 (Mo.App.1979).

Section 569.030 states, "A person commits the crime of robbery in the second degree when he forcibly steals property." Section 569.010(1) defines the term "forcibly steals," in relevant part, as "when, in the course of stealing, as defined in section 570.030, RSMo, [a person] uses or threatens the immediate use of physical force upon another person for the purpose of preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking." The Notes on Use of MAI–CR3d 323.04 indicate that preventing or overcoming resistance may be charged in only one of two alternatives: either while taking or retaining the property.

Under section 570.030.1, stealing is defined as, "appropriat[ing] property or services of another with the purpose to deprive him thereof, either without his consent or by means of deceit or coercion." There is considerable case law supporting the proposition that the "taking" is complete, for the purpose of conviction under both the robbery and stealing statutes, when the offender exercises dominion and control over the object inconsistent with the true owner or possessor's rights. *State v. Beatty,* 617 S.W.2d 87, 90 (Mo. App.1981). However, we do not believe that the word "taking" as used in the in-

struction is limited to this narrow construction.

■ First, the definition of "stealing" and "robbery" changed with the enactment of the new criminal code which became effective in 1979. Section 560.120, RSMo 1969, was held to require a "taking" (caption) and "carrying away" (asportation) of the property as two of the elements of stealing. *Beatty,* 617 S.W.2d at 90. **Caption and asportation are no longer elements of stealing; "appropriation" is the action which is prohibited.** Section 570.-030; *State v. Eby,* 629 S.W.2d 515, 519 (Mo.App.1981). "Taking" is included in the definition of "appropriation" under section 570.010(2), which describes methods of exercising dominion over an object. *Eby,* 629 S.W.2d at 519.

■ While the evidence is sufficient to support a finding of appropriation at the moment an offender wrongfully assumes complete dominion over the property of another inconsistent with the owner's rights, it is inaccurate to refer to this as a "complete taking." *Beatty,* 617 S.W.2d at 90. The issue of "taking" is relevant only to the extent that it shows an appropriation. Thus, we believe that the word "taking," as used in MAI–CR3d 323.04 refers to the general use of that word and not some term of art no longer relevant to the construction of the statute. The definition of "take" found in *Webster's New World Dictionary,* 2d ed., p. 1449–50, includes not only "to seize" and "to capture," but "to remove ... to carry or transport," as in "to take a book with one." We hold that the evidence was sufficient to find that the Cates was still in the act of taking, removing and carrying the property from K–Mart, at the time that he struck Ms. Bratton and knocked her off balance. There was no plain error; point denied.

■ For his second point, appellant claims the trial court plainly erred in instructing the jury on reasonable doubt as patterned after MAI–CR3d 302.04. He argues that the instruction unconstitutionally defines "reasonable doubt" in contravention of due process and *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339

(1990). The Missouri Supreme Court has repeatedly upheld this instruction, and its predecessor MAI–CR2d 2.02, as constitutionally sound. *State v. Griffin,* 848 S.W.2d 464, 469 (Mo. banc 1993); *State v. Blankenship,* 830 S.W.2d 1, 13 (Mo. banc 1992). We are not at liberty to overrule the last controlling decision of that court. *State v. Lumpkin,* 850 S.W.2d 388, 393 (Mo.App.1993); *State v. Weems,* 800 S.W.2d 54, 58 (Mo.App.1990). There was no error, plain or otherwise; point denied.

The judgment of conviction is affirmed.

All concur.